JONATHAN ROBINSON *v.* SETH RAYNOR and others.

In most, if not in all, cases of appeals from the decisions of surrogates, the whole case is to be examined by the appellate court, as well upon the facts as upon the law, so far as questions are presented by the appeal; and this rule applies as well to the Court of Appeals as to the Supreme Court.

Where services are rendered by one person to another in pursuance of a mutual understanding between the parties that compensation for them shall be made by will, and the party receiving the services dies without making the expected compensation, the party rendering the services is entitled to compensation out of the estate of the deceased, as a creditor, for the value of the services.

And in case there is an understanding that compensation shall be made, it is not material whether the failure to make it arose from accident or design.

Where D. R., twenty-five years or more prior to his death, abandoned his wife and his homestead, and from that time until his death did not reside with, or provide for her; but during the whole of that period she was taken care of and attended by J. R. her son, and his family, who resided in a house near by; they providing her with fire-wood, vegetables, &c., and laboring in her house and garden; and during the same period J. R. transacted all D. R.'s business for him; the evidence showing clearly that there was an understanding between J. R. and his father that the former should be compensated for such care of his mother and his attention to his father's business by a devise of the homestead; that D. R. had made three if not four wills, in all of which the homestead farm was devised to J. R., and that he had repeatedly, and until near the time of his death, promised and expressed his intention to make such devise: *Held*, that upon D. R.'s dying without having devised the farm to J. R., the latter could recover a compensation for his services, to be paid out of the estate of the deceased.

APPEAL from the judgment of the general term of the 2d district reversing a decree of the surrogate of the county of Suffolk.

David Robinson, who resided in Brookhaven, in said county of Suffolk, was the owner of a farm and considerable personal estate. Some twenty-five years before his death he deserted his wife, leaving her on the farm on which they had resided for several years previously, he himself going to reside about three miles distant. The children of said David had ceased to live at home before he left, and there was no one to look

after the farm or to take care of Mrs. Robinson. Jonathan Robinson, a son of said David, lived near his mother, and from the time his father left, he, Jonathan, and his family were accustomed to draw and prepare wood for her, stay with her at night, plant and take care of her garden, make her butter, do her washing, and rendered such other services as were necessary, and which she was unable to do for herself. Jonathan, being able to read and write, and his father being able only to write his name, he, (Jonathan) was called on to and he did occasionally transact business for his father. Nothing was ever paid for these services by said David.

It did not appear that the services rendered by Jonathan and his family for Mrs. Robinson were done or rendered at the request of said David. David died intestate, and his son Jonathan took out letters of administration on his estate, and after being so appointed administrator he presented a petition to the surrogate of Suffolk county, stating that his father in his life time was indebted to him for services rendered, and for which he was to be paid by a devise to him of his father's farm, and praying a decree that he be allowed therefor. The necessary parties were brought in, and a hearing was had before the surrogate, and on such hearing it was proved that on several occasions the said David said to Jonathan, and his children who rendered services to his wife, that he would pay them by conveying the farm and a piece of meadow land to said Jonathan.

Jonathan himself testified that his father told him if he would stay there he should have the farm; at other times he told him he had made his will and left him the farm. It was proved by others that David on several occasions declared his intention to give Jonathan his farm, and stated that he had made his will and given it to him.

On the other side it was proved that before the death of said David, Jonathan had said his father did not owe him any thing; that the father had told him, Jonathan, he would not give him the farm, that he (J.) had cut off his father's

land large quantities of cord wood, and that the services rendered were worth very little.

The surrogate found that services were rendered under a mutual understanding that Jonathan should receive compensation for his services by a devise to him of the farm, and that the services so rendered were worth the sum of $1250, which he directed the said Jonathan as, administrator of his father's estate, to deduct from the assets in his hand. The next of kin appealed from this decree to the general term of the Supreme Court, by which the decree of the surrogate was reversed. (See 36 Barb. 182, S. C.)

*J. H. Tuthill*, for the appellant.

*W. Wickham*, for the respondent.

Selden, J. The validity of the claim of the appellant, which was allowed by the surrogate, depends upon the question whether the appellant rendered services for his father in his life time, in pursuance of a mutual understanding between him and his father, that he was to be compensated for such services by a devise of the homestead farm, or other provision by will.

Where services are rendered in pursuance of a mutual understanding between parties, that compensation for them shall be made by will, and the party receiving the services dies without making the expected compensation, the party rendering the services is entitled to compensation out of the estate of the deceased, as a creditor, for the value of the services. An express agreement need not be shown, although if the services are gratuitously rendered, or rendered with the expectation merely, by the person rendering them, that they will be compensated by will, without any mutual understanding, express or implied, between the parties to that effect, they will not constitute a valid claim. It is not material whether the failure to make compensation, (where there was

an understanding that it should be made,) arose from acci-
dent or design.    These positions are too well settled to admit
of dispute.    (*Martin* v. *Wright's administrators*, 13 Wend.
460 ; *Quackenbush* v. *Ehle*, 5 Barb. 469 ; *McRae* v. *McRae*,
3 Bradf. 199.)

In the present case, there is no dispute that services to
some extent were rendered by the claimant to the intestate,
and that no compensation for them was made by will.    The
only questions to be decided, therefore, are, whether there
was an agreement or understanding between the claimant and
the intestate, that compensation of any kind should be made
for those services ; whether compensation was in fact made,
otherwise than by will ; and the value of the services.

These are questions of fact only, which in ordinary cases
would not be subject to review in this court ; but in most, if
not in all cases of appeals from the decisions of surrogates,
the whole case is to be examined by the appellate court, as
well upon the facts as upon the law, so far as questions are
presented by the appeal, and this rule applies as well to the
court of appeals, as to the Supreme Court.    (*Schenck* v.
*Dart*, 22 N. Y. Rep. 420 ; *Caujolle* v. *Ferrie*, 23 id. 90 ;
*Moore* v. *Moore*, 21 How. Pr. R. 211.)

A careful examination of the evidence, has convinced me
that the surrogate arrived at correct conclusions upon these
questions, and that his decree should not have been reversed.
In giving the reasons for this opinion, I shall not attempt to
review the testimony in detail, but will limit myself to a
statement of its general features, with brief references to the
most essential points.

The intestate, the father of the appellant, appears to have
been the owner of somewhat extensive tracts of land, of a poor
quality, generally, in Suffolk county, upon Long Island.
What was called the homestead, where he resided during the
earlier portion of his life, was composed of some four or five
hundred acres of land covered with wood, excepting about

N. Y. R.—28.              32

fifty or sixty acres, which, in its then existing condition, was capable of cultivation——the value of such cultivated part being variously estimated at from $2 to $10 per acre—and its products what might be expected from lands of such value. The intestate and his wife had ten children, one son (the present appellant,) and nine daughters. The daughters were all married, and had removed to places, at some distance from their father's residence, from eighteen to twenty years or more before the death of their parents. The son was also married many years ago, and having bought a piece of land near the homestead, built a house upon it, and has resided there, so far as the case shows, to the present time. The intestate, twenty-five years or more prior to his death, abandoned his wife and his homestead, and from that time until his death appears not to have resided with his wife, or to have paid much attention to her, although he was occasionally at the house, and contributed to some slight extent to her support. The sons of the appellant in succession, as they became of age to warrant their doing so, slept at their grandmother's, (taking their meals at their father's,) carted her wood, cut and carried it into the house, made her fires, ploughed, planted and hoed her garden, and waited upon her generally, as her necessities required. The daughters of the appellant washed and ironed and baked for her, and attended to her work whenever she was not able to do it herself. These attentions were continued during the whole time after the separation of the intestate and his wife until her death, at an advanced age, some two or three years, as stated by the surrogate, prior to the trial before him. I think the learned justice who delivered the opinion in the Supreme Court, has not given due weight to these general facts. The old lady's habits of simplicity and economy in living were extreme, and it is not remarkable that the evidence is meagre as to the amount and value of property furnished for her immediate use; but if she had consumed nothing, it is evident that the care and attention bestowed upon her by the appellant were

such as, except toward kindred, no one would undertake to bestow without large reward. In addition to the care of his mother, the appellant devoted considerable time to the business of his father.

The evidence of an understanding between the appellant and his father, that the former was to be compensated for this care of his mother and his attention to his father's business, by a devise of the homestead, is very strong. David Robinson, one of the appellant's sons, says, "I know about my father's doing business for my grandfather; he was often called upon and attended to it in preference to every thing else; whenever the old gentleman called he went; my grandfather often talked to me, and told me to take care of things for it would soon all be father's. I intend to give it to your father, and it will eventually be your's and your brother's. I have heard him say, father, when he had the farm, would have enough to pay him for his work he had done for him; services he had performed." Another son says, "I had conversation with my grandfather about working there a great many times; he never paid me; he said my father would have the place for the labor he was performing for them; told me that a great many times; told me a great many times that he had willed it to my father; told me that he would certainly have the place." Another son says, "I have talked with my grandfather about this work and the pay for it. He told me about the last time I saw him before he died, he should give father the home place." One of the daughters says, "I have heard grandfather say, time and again, he would pay us for all what we had done; that he would give father the home place from the south end to the Teconic river; and the meadow." Another daughter says, "He said we should all be paid for what we had done; he should give us the home place and the meadow."

The appellant testifies that his father "cropped them [lots which he had manured] until he had cropped them all out, and then gave it [the farm] up to me, and told me if I would

manure it I might have the farm, and he always took part of the first crop; he said if I would stay there I should have the farm; said the girls should not have a foot of it; and when they persuaded him to destroy his last will, he repeated it, and said he would give it to me. I told him he was an old man and ought to make his will. He said he would; told me to go to Joel's and get the will written. I said no, he-must·go, and could have one of my boys. I did all my father's business for thirty years. He never gave me $20; never gave me but one dollar."

*Nathan Raynor* testified that he had seen Jonathan and his children at the old lady's cutting wood; that he hired $150 of the old man; that Jonathan wrote the note and attended to the business; that the old man was not competent to write himself, further than to write his name. *Silas Carter* stated that Jonathan used to do considerable business for his father; knew him to travel about with the old man, had known him write notes, &c.

Joel Robinson (whether a relative of the parties or not does not appear) testified as follows: "I can't say how many wills I have written for the old man, three or four. Wrote the first one ten or fifteen years ago. In all those wills he gave the homestead farm to Jonathan; I remember seeing a will in his possession in your [the contestant's counsel's] handwriting that gave the homestead farm to Jonathan. I wrote the last will not over three or four years before his death. I had his last will in keeping; he came for it not a great while before he died; four or five or six months, can't say how long; he destroyed it in my presence, tore his name off. He said it was very likely he should call again, and want another one wrote; if things went to suit him he should call again. I have heard him always say he meant Jonathan should have the homestead; this was when he came to have writing done; he said he had always willed it to him, and he meant he should have it."

There is some evidence, mainly of declarations of the intes-

tate, calculated to produce conclusions different from those to which I have arrived, both as to the amount of services rendered by the appellant, and as to the manner in which he was to be rewarded for them; but there is nothing contradicting in any material respect that to which reference has been made, or which can greatly weaken its force. In regard to what was done by the appellant and his children for the old lady, the testimony is that of the daughters and granddaughters of the intestate, who state what *they* did, and what they saw during their visits to their mother and grandmother. Some of them visited her quite frequently; during part of the time every week or oftener, and during other parts less often; others once in two or three months, and others not oftener than once a year. During these visits, the old lady herself appeared to do all that was done about the premises, which are represented as uncleanly and in bad condition, as though very little was done by any one. They however speak of the drawing and cutting of wood by the appellant's sons, and of their lodging at the house. Phebe Raynor, one of the daughters of the intestate, says that she was the last one that went away from home, and that she left in 1839. This, as nearly as can be ascertained from the case, (which is exceedingly deficient as to dates,) was at least eighteen years prior to the death of her mother. It is fairly to be inferred, from the testimony of these witnesses, that the old lady lived very poorly; that but slight provision was made for her wants, and no very great attention paid to her comfort by any one. This may have been owing to a neglect of filial duty on the part of the appellant, but is as likely to have arisen, to some extent at least, from a strong desire on the part of the mother, not unusual in such cases, to live as nearly as possible without dependence upon her children.

All the testimony offered on behalf of the contestants tends, not to overthrow, but to confirm the position that for twenty years or more the *responsibility* of taking care of the

old lady rested upon the appellant and his family alone. The daily attention which her circumstances demanded, during nearly all that time, was rendered by the defendant and his children. Whatever was done by others was casual, and accidental; and although the attention thus bestowed by the defendant and his family may have appeared trifling to casual visitors, it is impossible not to see that the necessity of rendering them imposed a constant and burdensome responsibility upon the appellant, without reference to the amount of services rendered or of supplies furnished.

The evidence offered, to show that the appellant was paid for his care of his mother, by the use of the farm and by wood taken from it before his father's death, consisted mainly of declarations of the intestate, made about fifteen years before his death during the progress of a church trial, the result of a difficulty between the appellant and one Gordon, who had obtained from the intestate the title to a piece of land which the appellant had enriched with ashes. The intestate on that occasion said to the appellant, that he had agreed to let him occupy the place if he would take care of his mother and pay the taxes, and that he had not done it; that when a barrel of flour was wanted he (the intestate) had got it; and when fish was wanting he had got it; and that he had sold a piece of land as he had a right to do. The appellant made no reply. The intestate was inquired of by the minister, if he had not promised his son that he would give him the place, to which inquiry he made no answer. The intestate also charged the appellant with cutting large quantities of wood. One witness testifies that "the old man said, 'you have cut a thousand cords of wood off the place I presume;' I am not sure, it was hundreds at any rate." Another testifies that "the old man told Jonathan he had cut three thousand cords, and he should not cut any more; Jonathan said nothing but turned away; he usually did so; never spoke a saucy word to the old man." This witness gives the only estimate which the case presents

of the quantity of wood actually cut. He says, "perhaps three hundred to five hundred cords were cut under Jonathan." It was shown to have been worth one dollar per cord. All the witnesses who speak on the subject agree, that the annual value·of the use of the farm, aside from the cutting of wood, was from ,forty to fifty dollars. One of the appellant's sons states, that the intestate often had a part of the crops; that he at first cultivated all the best part himself, and gave the farm up to the appellant "by piece-meals." That his father bought three thousand bushels of ashes and put on the farm, and all the farming he ever did there did not pay expenses. The appellant testifies, that he paid his father for more wood than he ever cut; that he put $1000 worth of ashes on the farm, and never got the interest of the money it cost him.

Whatever might be the force of the evidence produced on the part of the contestants, if there were no circumstances in the case to overcome it; the conclusive answer to it is, that after all the facts occurred to which that testimony relates, the intestate made three if not four wills, in all of which the homestead farm was devised to the appellant, and the intestate repeatedly promised, and expressed his intention to make such devise, in consideration of what the appellant and his children had done and were doing for him; these declarations and promises being continued almost to the time of his decease. The declarations of the appellant which were proved do not aid the respondents. When asked to state whether he had any claim against his father, he replied that he had not; and when asked to execute a release he refused, unless his father gave him a deed. All this accords with his present position. In connection with this evidence some circumstances were disclosed, calculated to induce a belief that influences not altogether worthy of approval were brought to bear upon the mind of the intestate, to prevent the carrying out of his just intentions toward the appellant. *Joseph Dayton,* a witness called by the respondents, says: "Less

than a year before the old man died I saw Jonathan, and he told me about the old man's destroying his will: I told him I heard he had a claim against the old man for $3000, and when the old man died he intended to fetch it in. He said it was as big a lie as ever was told; they are making all this up to hinder the old man from giving me any of his property." One of the appellant's daughters says: "Grandfather said some of them had been to him and told him father had forged a deed for the place, he said that made him mad and he destroyed the will. Afterwards I heard him say he would make it all right." There may have been no sinister design in the origin of these stories, but the suspicions of the appellant upon that subject are certainly not unreasonable.

It is stated in the opinion of the Supreme Court, that "the services were those acts of kindness and affectionate regard which most sons would have been happy to have rendered, to an aged and lone mother." This is very true, but it is equally true, that for such services aged parents who have the ability, are equally happy to make compensation. When such services are rendered for many years in succession by one only, of several children, the natural feelings of parents usually coincide with the dictates of justice, in bestowing upon such child some special reward on that account. Although the services in this case were not rendered to the intestate directly, yet the evidence shows that they were rendered at his request, to one for whom he was bound to provide, and with a perfect understanding between him and the appellant, that compensation was to be made for them by the devise to the latter of the homestead farm. The evidence also leaves very little room to doubt, that until a very late period of his life the intestate designed to carry out that understanding, and would have done so had no artifice been resorted to, to prevent it. It is not material, however, in what manner the failure to carry out the understanding was produced; the fact of the failure entitled the appellant to compensation out of the estate for his services,

and the sum allowed by the surrogate on that account was not unreasonable.

The judgment of the Supreme Court should be reversed, and the decree of the surrogate affirmed with costs.

HOGEBOOM, INGRAHAM, WRIGHT, JOHNSON and DAVIES, JJ. concurred.

MULLIN, J. dissenting.   The surrogate has found as matter of fact, that Jonathan Robinson performed services for his father and mother for the whole period of twenty-five or thirty years, for which it was mutually understood between them that he (Jonathan) should receive compensation by a devise of the homestead farm.

No express agreement is proved or pretended, on the part of Jonathan, to perform services for his father and mother, or on the part of the father that he would pay therefor at any time or in any manner.   The evidence relied on to establish the liability is a recognition of it by the father, and a promise given that he would convey the farm in satisfaction.

The law implies a promise to pay when the services are rendered at the request of the defendant, and when there is no request proved, but they are rendered with the knowledge and tacit assent of the defendant.   (*James* v. *Bixby*, 11 Mass. Rep. 34; *Farmington Academy* v. *Allen*, 14 id. 174.) But however valuable the services rendered may be, yet if they are rendered without the privity or consent of the person for whom they are rendered, the law affords the party rendering the service no redress.   (*Bartholomew* v. *Jackson*, 20 John. 28.)

These rules apply in actions between persons not members of the same family.   As between them, different rules are applied, (*Williams* v. *Hutchinson*, 3 Comst. 312;) or rather a higher degree of evidence is required to establish the liability in the one case than in the other.   (*Moon* v. *Moon*, 21 How. Pr. R. 211.)

If a child who lives with a parent after it becomes 21 years of age, and renders service and is treated as a member of the family, no agreement to pay being proved nor account kept of board or clothing, the law will not presume an agreement to pay, but will presume the services to have been rendered gratuitously, or at least to be fully compensated by the support furnished.    (*Williams* v. *Hutchinson*, 3 Comst. 312.)

But again, when the person rendering the service is a member of the same family at the time the service is rendered and is a near relative, so near, and the service of such a nature, that their performance would be prompted as well by affection as by desire for gain, the law will not imply a promise to pay, unless the circumstances are such as clearly to rebut the presumption that they were rendered gratuitously. (1 Parsons on Cont. 529 and notes.)

The services in the case before us were rendered by a son, or by those of his family to whose services he was lawfully entitled, to his aged and infirm mother who had been deserted by her husband, and left without any human being to take care of her or supply her wants, except so far as the use of the house and garden might enable her to supply them.    If there is any case in which a child, possessed of human affections, could be presumed to render services gratuitously, this is the one.    In the course of the twenty-five or thirty years during which this aged lady was left destitute and alone, this son furnished to her but a single barrel of flour and a few other articles of food.    If he drew her a little fire wood, he seems to have cut largely from his father's farm and for which he has never accounted.    If his children made butter for her, they took half the product; if they cultivated the garden, they had the use of part of the land.    Under such circumstances, if the son intended to charge the father for services, it was his duty to so inform him, or to prove such circumstances as would rebut the presumption that they were gratuitously rendered.

But it is said that such presumption is rebutted by the

repeated declarations of the father that he intended to give
to the son the farm at his death, as a compensation for his
services and those of his family, and from the further fact,
that in several wills made by him, the father devised the
farm to the son.

Declarations of the intestate are proved, to the effect that
he intended to give the farm to the son, and that he had in
one or more wills, made and destroyed before his death, de-
vised the farm to the son.    But this evidence is fully answer-
ed and overcome by the evidence on the other side, of the
repeated statements of the son, that he had no claim against
his father, and that too when the father called on him to
know whether he had a claim which he ultimately intended
to bring against him.    The son had very considerable wood
off the father's farm and for which no account was kept or
rendered.    And all inference favorable to the claim for ser-
vices by reason of the making of a will or wills devising the
farm to the son is fully met by the destruction of those
instruments, which is a very significant act to show that he
did not deem the son entitled to it.

The general term decided the case correctly on the merits,
and their judgment should be affirmed.

DENIO, Ch. J. concurred with MULLIN, J.

                                                 Judgment reversed.