# Cases

# FOURTH DEPARTMENT

AT

# GENERAL TERM,

## April, 1877.

LYDIA A. SHAKESPEARE, Appellant, *v.* WILLIAM G. MARKHAM, Executor, etc., and others, Respondents.

*Surrogate — jurisdiction of, over claim presented by executor — Agreement to leave property by will — must be certain and definite — service rendered in expectation of — remedy of party rendering the services.*

A surrogate has no jurisdiction or authority to pass upon the validity of a claim against an estate presented by an executor in his own behalf, where the same is contested, nor can a reference be ordered in such a case to determine the same, though all the parties consent thereto.

Where one person renders services to another in the expectation of receiving a legacy from him, relying solely upon the testator's generosity, there being no contract, either express or implied, that compensation shall be made therefor by will, and the party for whom the services are rendered dies without making such provision, no action will lie in favor of the person rendering the same.

Where, however, a certain and definite contract to leave property by will is clearly established, and the promisee has fully performed the contract on his part, a court of equity will, in a case free from all objection, either on account of inadequacy of consideration or of other circumstances rendering the claim inequitable, compel a specific performance thereof.

Specific performance of such a contract refused in this case, for the reason that the terms and provisions thereof were not sufficiently certain and definite.

Where the contract is too indefinite and uncertain to authorize a decree of specific performance, the remedy of the party who has rendered the services is to bring an action before some tribunal competent to pass upon a disputed claim, to recover the actual value of the services rendered, as upon a *quantum meruit.*

The measure of damages in a case in which the claimant seeks to recover on an agreement to support and maintain the testator during the term of his natural life, is the amount which the board of the testator, and his nursing during his last illness were reasonably worth, less the value of any services rendered by him.

The expenses incurred by an executor in an unsuccessful attempt to enforce before the surrogate, a claim made by him against the estate, including the fees of an auditor and his own counsel fees therein, should not be allowed to him out of the estate.

APPEAL from a decree of the surrogate of Monroe county, rendered upon the final accounting of William G. Markham, as executor of the last will and testament of Wayne Markham, deceased.

*J. L. Hawes*, for the appellant. The Surrogate's Court had no power to adjudicate upon the joint claim against the estate made by the executor and his three sisters. (Dayton, Surr., 394, 549, 551, 552, 553; id., 507–509 [3d ed.]; *Merchant* v. *Merchant*, 2 Bradf., 432, 447; 3 R. S. [5th ed.], 175, §§ 37, 38; *Tucker* v. *Tucker*, 4 Keyes, 136, 147; *Estate of John Shaw*, 1 Tuck., 352.) This being a disputed claim and not having been determined by any authorized tribunal, could not be determined on final accounting of the executor. (*Tucker* v. *Tucker*, 4 Keyes, 136; Redf., Surr., 391, 395; *Wilson* v. *Baptist Edn. Soc.*, 10 Barb., 309, 316; *Curtis* v. *Stilwell*, 32 id., 354; *Magee* v. *Vedder*, 6 id., 352.) A promise to pay deceased relatives for services will not be implied, and unless one is clearly proved they will be attributed to affection and generous kindness, or benefit received. (*Margaret Keller's Estate*, 1 Tuck., 28; *Osburne* v. *Osburne*, 1 Bradf., 356; *Bowen* v. *Bowen*, 2 id., 336; *Robinson* v. *Cushman*, 2 Den., 149; *Williams* v. *Hutchinson*, 3 N. Y., 312; *Delmott* v. *Taylor*, 5 N. Y. Sur. R., 417; *Weir* v. *Weir's Admrs.*, 3 B. Mon., 645.) Claims for service rendered in consideration of a promised legacy can only be sustained by positive and convincing proof. (2 Redf. on Wills, 281, 282; *Graham* v. *Graham*, 34 Penn. St., 475; *Thompson* v. *Stevens*, 71 id., 161; *Neal* v. *Gilmore*, 79 id., 428.) This contract, if it could be considered one, was utterly void for uncertainty and indefiniteness. There was no definite legacy proposed. No specified property or fixed amount to be left. (17 S. & R., 45.) The measure of recovery in all such cases is the

value of the services. (*Lisk* v. *Sherman*, 25 Barb., 433; *Quacken-bush* v. *Ehle*, 5 id., 469; *Erben* v. *Lorillard*, 19 N. Y., 299; *Rob·inson* v. *Raynor*, 28 id., 494; *Ham* v. *Goodrich*, 37 N. H., 185, 190; *Graham* v. *Graham*, 34 Penn. St., 475; *Hertzog* v. *Hertzog*, 34 id., 418; *Sherman* v. *Kitzmiller*, 17 S. & R., 45; *Swedes* v. *Wild*, 7 How. Pr., 309; *Calkins* v. *Falk*, 39 Barb., 620; *Jacobson* v. *Execu-tor*, 3 J. R., 199; *Patterson* v. *Patterson*, 13 J. R., 379; *Wright* v. *Martin*, 13 Wend., 460; 71 Penn., 161.) Any other rule of damages would violate the statute of wills and validate a verbal will, or, in· this case, a verbal revocation of a will. (3 R. S. [5 ed.], 138, 141; *Graham* v. *Graham*, 34 Penn. St., 482.) A portion of his prop-erty, at the time of the claimed arrangement, was real estate; it was therefore void by the statute of frauds. (Brown on Frauds, §§ 65, 66; Roberts on Frauds, 272.) If this was a contract it was entire, embracing realty and personalty, and therefor as well as for its uncertainty, utterly void, and could not be the foundation of an action or even resorted to for a measure of compensation. (*King* v. *Brown*, 2 Hill, 485; *Van Alstine* v. *Wemple*, 5 Cow., 162, *Erben* v. *Lorillard*, 19 N. Y., 299, 433; *Lisk* v. *Sherman*, 25 Barb., 433; 11 Casey, 23–28.) The executor should not have been and should not now be allowed the item for counsel. (26 Barb., 316; 25 How., 5; 26 N. Y., 441; 39 Barb., 172.)

*A. M. Bingham*, for the respondents. The validity of the agree-ment upon which this claim is based is settled by the following cases: *Dresser* v. *Dresser* (35 Barb., 573); *Thompson* v. *Stevens* (21 Penn., 161); *Lees* v. *Hale* (10 Wend., 426). The fourth objection is to the allowance of $260 counsel fee. There is no error in the allowance of this item that appears in the case. If the appellant claims that such fees were not properly allowed to the executor, he should point to some irregularity in such allowance so that the facts relating to the same might appear by the return of the Surrogate's Court. (*Bainbridge* v. *McCullough*, 1 Hun, 488.) The rule seems to be fully settled that where a contract is sufficiently certain to form a basis for calculation, so that it can be made definite by extrinsic evidence, it will be enforced. (*Gilman* v. *Gil-man*, 2 Lans., 1; *Richards* v. *Edick*, 17 Barb., 260; *Thompson* v. *Stevens*, 71 Penn., 161; *Fish* v. *Hubbard*, 21 Wend., 651.)

TALCOTT, J.:

This is an appeal from the decree of the surrogate of Monroe county, finally settling and adjusting the account of William G. Markham, as executor of the estate of Wayne Markham, deceased. The plaintiff is the granddaughter of the deceased, and sole legatee for life of the whole estate of the deceased, with remainder to the heirs of her body, share and share alike. She and her children are the sole lineal descendants of the testator, who died at the town of Rush, in Monroe county, in August, 1872, at the age of seventy years and upwards. The respondent William G. Markham, of the town of Rush, a nephew of the deceased and a son of Guy Markham, of Rush, is one of the executors named in the will of the testator, and caused it to be proved before the surrogate of Monroe county, and took upon himself the sole trust and duty of the execution of the will, the other persons named therein as executors being residents of the State of Michigan. The proceeding for a final accounting was at the instance of the said executor. His account presented for settlement, as his final account, credits the estate of the testator with the sum of $6,002 in the bank of Avon at the time of the decease of the testator, fifty-two dollars in cash in the possession of the testator, and other amounts realized by the executor from the sale of small amounts of personal property, the whole estate amounting to $6,199.75. The said account credits the executor for funeral expenses paid, and for the expenses of administration, including twenty-nine dollars for counsel fees, the whole amounting to $636.79. The executor then makes a charge, as follows:

"To amount claimed by the executor jointly with Mary Markham, Emma Puffer and Isabella Dunsford, under a contract with testator for his maintenance during his natural life, $5,542.06," being the precise balance of the estate which had come to the hands of the executor.

The appellant having been cited appeared before the surrogate, and interposed objections in writing to the allowance of said account, in substance as follows:

First. That the executor has not credited the estate or charged himself with interest on the cash in the bank of Avon, although he has had the use of and interest upon the said sum of money in said bank of Avon and elsewhere.

Secondly. That the item of $5,542.96 charged against the estate, as claimed by the executor jointly with others, is erroneous, and should not be allowed by the surrogate, for the following reasons:

First. That the said claim as charged in said account is wholly false and fictitious, and is not a legal charge against said estate or said executor, nor is said estate or said executor liable for the payment of the same or any part thereof.

Second. That said executor has not paid said amount or any part thereof to any person.

Third. That no voucher evidencing such payment is produced.

Fourth. That no claim for the payment of said amount of $5,542.96 has been presented by, or on behalf of said executor alone, or with other persons, to the surrogate, supported by affidavit as required by statute in case of claims made by executors against the estate in their hands for settlement.

Fifth. No proper or sufficient proof of said claim has been made before said surrogate.

The objections of the appellant contain three other objections to the said account and the affidavit accompanying the same, and conclude with an objection that the surrogate has no jurisdiction or authority to pass upon or allow the disputed claim of Mary Markham and others, whether considered separately or jointly with the claim of the executor. Upon filing the said objections, the surrogate overruled all the objections to his jurisdiction, and made an order, referring it to an auditor to hear, examine and report on the claim made by the executor jointly with Mary Markham and others. The auditor reported in favor of the allowance of the claim, and the testimony taken before him constitutes a part of the case. From the auditor's report of the testimony it appears that, at the commencement of the proceedings before him, it was agreed by the parties that the said auditor should take the proofs of the said claim and pass upon and determine the same, and report thereon to the surrogate, with his opinion, in pursuance of the order of the surrogate. The auditor made his report sustaining the claim on the 17th of July, 1875. On the 27th day of July, 1875, the attorney for said executor filed a paper in the office of the surrogate, containing a statement of the claim, by Emma Puffer, Mary Markham and M. Isabel Dunsford, with their several affidavits that the same

was true in all respects; that no part of the same had been paid and that no offsets exist against said account. The claim was stated as follows: "The estate of Wayne Markham in account with S. Emma Puffer, M. Isabel Dunsford and Mary E. Markham, jointly with William G. Markham, executor: To amount due upon contract for support, $6,000, our interest being three-quarters of the amount upon equal distribution, to wit: $4,500." The same paper also contained an acknowledgement, dated January 1, 1874, purporting to have been signed by S. Emma Puffer, Mary E. Markham and M. Isabel Dunsford, that they had received their "several interest in the foregoing claim" from the executor. On the 29th day of July, 1875, a final hearing was had, and a motion was made on behalf of the executor to confirm the report of the auditor, and thereupon the appellant filed written objections to the facts found and the conclusions of law of the auditor upon various special grounds touching the validity of the claim, and also objected that the executor had not complied with the statute providing for the proof of claims in favor of executors against estates in their hands, and renewed substantially the same objections she had previously made to the authority of the surrogate to pass upon the claim and to the form of the verifications. Afterwards, and during the said final hearing, the surrogate allowed the executor to file a new statement of the claim substantially in the same form as stated in his account, with the additional statement that he had paid to the other joint claimants their distributive shares, with the usual affidavit of verification, and° that the account actually accrued against Wayne Markham in his lifetime, and that no part thereof had been paid or settled as to him, the executor, nor except as paid by him to the other joint claimants thereof. To the filing of this paper the appellant also objected, and again renewed her objection to the power and authority of the surrogate to pass upon the same. All the objections made by the appellant to the report and opinion of the auditor, and to the power and jurisdiction of the surrogate, to the form and verification of the accounts, and all her objections were overruled, and on the 13th day of December, 1875, the surrogate made a decree in the proceeding, sustaining the report and opinion of the auditor allowing said joint claim, and finally settling the executor's account. The account was finally settled, as rendered by the executor, except that the latter was

charged interest on $6,000, for six months, and was credited in gross with $260 counsel fees, and $60 auditor's fees; it not appearing, however, that any vouchers for said counsel fees, or auditor's fees, were presented, or any specification of the items given. On this case the first question to be determined is, whether the surrogate had any jurisdiction to pass upon the said joint claims, or any authority to allow the same as a part of the executor's account.

The long controversy which has existed on this subject in the courts was, as we understand, finally put at rest by the decision of the Court of Appeals in the case of *Tucker* v. *Tucker* (4 Keyes, 136). A reference to the various preceding decisions of the various courts on the subject may be found in the elaborate opinion of the surrogate of New York, in *The Matter of the Estate of John Shaw* (1 Tucker, 352.)

In the case of *Tucker* v. *Tucker* (*supra ;* also reported in 4 Abbott's Decisions of the Court of Appeals, 428), it is expressly held, that upon a final or litigated accounting of an executor, the surrogate has no jurisdiction to try the validity and amount of a disputed demand against the estate. That the consent of the parties to go on before the auditor cannot be sustained as an arbitration, is also held in the same case, upon the ground that consent cannot confer jurisdiction of the subject-matter, upon a court professing to act as such, but proceeding without jurisdiction of the subject.

The whole proceeding by and before the surrogate of Monroe county, in this case of a disputed claim against the estate, by which the claim was allowed was *coram non judice*, and void. But, as we are desired to examine the merits of the claim itself, we proceed to do so, in the hope that it may possibly tend to prevent further litigation between the parties.

It appears that the testator had been for some time a resident of Kalamazoo, in the State of Michigan, where he made his will bearing date the 18th day of March, 1871, while he was residing in the family of appellant and her husband. About the month of April, 1871, he wrote to his brother, Guy Markham, of Rush, in the county of Monroe, in this State, that he had had some misunderstanding or difficulty with Shakespeare, the husband of the appellant, and that he was under the necessity of seeking a new home, and that he would like to come and live with the said Guy Markham and his (Guy's)

children, saying he thought he could make himself as useful to Guy and his family as any place he could go to, and would be willing to do so as far as his health would permit; that if he could do so, he would pay them for all trouble and expense, if he had enough to do so with, and that what little property he had would go to the person or persons who befriended him in his old age, stating that he thought he should save of his property over $6,000, and requesting the said Guy to come out to Kalamazoo so that he could talk and advise with him. Guy Markham, in pursuance of such request, went to Kalamazoo, when the request was repeated, that the testator might come and live with him (Guy). Guy consented to the proposition for himself, but informed the testator that he could make no arrangement with him until he had conferred with his (Guy's) wife and children. In about the month of May, 1871, the testator came to the home of Guy Markham, in the town of Rush, and remained there as one of the family till he died, in August, 1872.

Guy Markham lived on a farm of 250 acres in the town of Rush, owned by him, but the business of the farm was carried on by the defendant, William G. Markham, and in his name, and it was understood that all the produce of the farm belonged to William G., without, so far as appears, any definite agreement. Guy Markham had also three daughters, who superintended the household matters, and it was understood in the family that the said three sisters were jointly interested with William G. in the avails of the farm, although no definite arrangement to that effect existed between them. Guy Markham and his wife lived in the family. One of the daughters, Mrs. Puffer, resided with her husband in South Carolina, but was generally at her father's house in Rush, during the summer. Another one of the daughters, Mary, was frequently absent from home. The testator appears to have been a carpenter by trade, but had been engaged in carrying on a bookstore in Kalamazoo, in copartnership with the appellant's husband. After the testator came to Rush, he fitted up a room in the house for himself, and occupied the same until his death. Soon after he came to Rush, some talk was had about the terms on which he was to live there, but no definite agreement was made until some time about the month of July, 1872, when the children all being at home, the testator caused them all to be assembled together with

Guy Markham and his wife, stating that he wished to get the family all together, to state to them what the bargain was, in relation to his living there, and it was then arranged between the testator and the said family of Guy Markham that they should support him as long as he lived, and for such care and support he was to give them all his property. This was said to the children individually, and it was then understood that if one failed to furnish such care and support the other would do it. There was nothing agreed as to when the property was to be delivered, or as to the manner in which it was to be conveyed or secured; and it was not the understanding of the parties that the property or any part of it should be delivered in the lifetime of the testator, but the same was to be used and controlled by the testator during his life. The auditor to whom the matter was referred reports, as a matter of fact, that the agreement was made by and between the testator and the four children, but the opinion of the auditor on matters of fact was not controlling to the surrogate. The whole evidence was before him, and is before this court. We think it quite uncertain upon the testimony whether or not the four children of Guy Markham were the only persons whom the testator supposed were to agree to furnish him the support, etc., which he intended to provide for. Guy Markham testifies that when he saw the testator in Michigan the latter said, "if he could come and live with me he expected I would have what he had; whoever took care of him should have what he had. He said he had no one else he wanted to leave his means with, but those who took care of him in his old age." * * * "When we got home I told the children what proposition he had made, and if they agreed to it it would be all right. He told her [Guy Markham's wife] he wanted to live with us, and compensate us with his means."

Mr. Puffer states, in reference to the assembling together of the family, when the contract was made: "He wanted to see the whole family together to have it sanctioned, and have my consent to it."

Mr. and Mrs. Guy Markham were present at the conversation when the agreement was made, as members of the family. Guy Markham was the owner of the house in which the testator lived, and of the farm, from which, at all events, the principal part of his support was expected to be furnished, and was the head of the

family in which the testator desired and expected to spend his days. The children were, as Guy Markham says, "running the farm with his advice and consent." It does not appear that there was any definite arrangement on the subject, or any agreement for running the farm, but what Guy Markham might have put an end to at any time, by his mere volition. It does not appear that his children had any independent property which would enable them from their own means to furnish such support as he (the testator) desired. It appears to us, that the idea of the testator was, so far as any binding contract was to be made, that the agreement was with Guy Markham, and that the conversation at which the children were present was for the purpose of having the arrangement generally understood in the family, and acquiesced in. According to Puffer's testimony, at the time of assembly of the family, and after the conversation, in which such contract was made, was held, the testator said "that he was very glad that everybody consented, and that it was settled." The claim in the case is made in behalf alone of the executor and the other children of Guy Markham. It seems to us that the testator understood, at all events, that Guy Markham, the recognized head of the family, which he was dealing with as a family, was certainly interested, if not solely interested in the contract. On the other side, so far as any precise contract was intended, in fact, it was an arrangement which neither party contemplated at the time as a binding contract, founded upon a valuable consideration, between the testator and anybody, except Guy Markham, but in which, for the sake of harmony, the general acquiescence of the entire family was desirable.

The will of the testator, before referred to, appointed the defendant, William G. Markham, as one of the executors. He propounded it for probate, and he only of the persons named as executors took upon himself the trust and duties.

It was well known in the family that the testator had such a will, and on one occasion he went with Guy Markham to the neighboring village of Avon, with the avowed purpose of having his will changed. The executor admits that he knew the testator had a will, but did not know the contents of it. He had before told Guy Markham that "he wanted to alter it so that Shakespeare should not get any of his property." So that it was known in Guy Markham's

family not only that the testator had made a will, but that it was a will under which the testator, at least, was apprehensive that the husband of the appellant might claim some interest in the property he should leave, or some part thereof, which was wholly inconsistent with any agreement or settled determination that Guy Markham's family should have his entire property.   It appears that on one occasion when he went to Avon, a neighboring village, for the avowed purpose of having his will changed, Guy Markham accompanied him, but he was readily persuaded by Guy to abandon the purpose for the time being, on the ground that it would be better to consult a lawyer of more experience than such as could be found at Avon — one that Guy suggested, residing at another place.   There is much testimony tending strongly to show that the claim in behalf of the executor and the other children set up in the executor's account is an after-thought, and that it was not pretended by the executor, for a considerable period after the death of the testator, that he and his sisters were entitled to the whole of the testator's property after his death.   The executor's letters and conversations clearly show that at first a claim to the entire property was not intended.

The plaintiff and her children are the only lineal descendants of the testator, his sole heirs at law, and the natural objects of his bounty as well as his universal legatees.

The estate of the testator, at the time of the arrangement with the family of Guy Markham, seems to have consisted almost entirely of personal property, such as bonds, mortgages and notes, and money deposited in bank.

The only interest he appears to have had in real estate at that time was some title or interest in two cemetery lots, one at Clarkson, in Monroe county, where his wife had been buried, and in which the testator desired and expected to be and was buried, and one at Kalamazoo.   Probably these cemetery lots were not understood to be embraced in what the testator termed his property, or his "means," and were not intended by him, or understood by the other parties, to be embraced in the arrangement or understanding, such as it was, in reference to the disposition of his property after his death, as a compensation to those who should take care of him until he died.   We do not think, therefore, that the supposed contract was void, under the statute of frauds, as an agreement to con-

vey real estate not in writing. But there are other objections to the parol proof of this supposed contract, which, in our view, are fatal to its operation as a definite contract. Such contracts have a tendency to subvert the statute of wills, and to do away with all those safeguards in respect to the posthumous disposition of property with which the law surrounds such instruments.

Where a party renders services to another in the expectation of a legacy, and in sole reliance on the testator's generosity, without any contract, express or implied, that compensation shall be provided for him by will, and the party for whom such services are rendered dies without making such provision, no action lies, but where, from the circumstances of the case, it is manifest that it was understood by both parties that compensation should be made by will, and none is made, an action lies to recover the value of such services. (*Martin* v. *Wright's Admrs.*, 13 Wend., 460 ; *Patterson* v. *Patterson*, 13 Johns., 379 ; *Jacobson* v. *Le Grange*, 3 id., 199 ; *Lisk* v. *Sherman*, 25 Barb., 433 ; *Quackenbush* v. *Ehle*, 5 id., 469 ; *Erben* v. *Lorillard*, 19 N. Y., 299 ; *Robinson* v. *Rayner*, 28 N. Y., 494 ; *Graham* v. *Graham*, 34 Penn. St., 475.)

There is, upon the authorities, no doubt that in a case where a certain and definite contract is clearly established, even though it involves an agreement to leave property by will, and it has been performed on the part of the promisee, equity in a case free from all objection on account of the adequacy of the consideration, or other circumstance rendering the claim inequitable, will compel a specific performance, though as an original question it might be considered doubtful whether in any such case, especially when the contract is sought to be established by parol testimony, so patent a means for the evasion of the provisions for the security of property, furnished by the statute of wills, should have been allowed. But courts of equity having been pressed by the hardship of particular cases, and the unreasonable and, perhaps, often fraudulent conduct of the decedent have made precedents on the subject which have resulted in the establishment, as a principle of equity law, that in such cases the court will often decree a specific performance, and charge those holding the property under the will with a trust for the benefit of the party to whom it was agreed to be given. (*Parsell* v. *Stryker*, 41 N. Y., 480.) But in the cases in which such con-

tracts are set up, and especially where they are attempted to be established by parol testimony, the temptation and opportunity for fraud is such that they are looked upon with suspicion, and the courts require the clearest evidence that a contract founded on a valuable consideration, and certain and definite in all its parts, should be shown to have been deliberately made by the decedent. (*Ogilvie* v. *Ogilvie*, 1 Bradf., 356 ; *Bowen* v. *Bowen*, 2 id., 336 ; *Williams* v. *Hutchinson*, 3 N. Y., 312 ; *Robinson* v. *Raynor*, 28 id., 494 ; *Lisk* v. *Sherman*, 25 Barb., 433, and cases before cited.) It is claimed that the contract relied upon in this case is within the statute of frauds, as one not to be performed within a year. In regard to this question the state of the law may be said to be uncertain. The case of *Dresser* v. *Dresser* (35 Barb., 573) went to the Court of Appeals, where, as stated by Mr. Abbott, two opinions on this point were delivered, one holding the contract void, the other, valid ; but the court did not pass upon the question. (Table of Cases Criticised, 1 Abbott's Dig. of New York Reports, lxiv.). The case in 35 Barbour is stated to have been followed by the General Term in the third department in *Kent et al.* v. *Kent et al.* (1 Hun, 529), but the latter case is not fully reported.

But waiving the question arising upon the statute of frauds, we think the contract, as appearing in the evidence, is too uncertain to require a specific performance — such a performance as this executor has undertaken to render by his account. First. It seems to us, if it be admitted that the executor and his sisters were at all interested as contracting parties, yet Guy Markham was also interested as the principal party contracting with the testator. Second. The amount to be given, after the death of the testator, to the parties who should have supported and taken care of him till death, was obviously, as shown by the repeated declarations of the testator to various members of the family, intended as a compensation for such services, and to go to the person or persons only who had performed such services.

There was no contract to devise or bequeath to the executor and his sisters jointly, share and share alike, the entire amount of the testator's estate, and it is evident from the testimony that the services of all were not equal, or expected to be so. Third. The services to be rendered were uncertain in their character, not only in respect to

the time of continuance, but in regard to their nature and character. Fourth. The compensation to be made for the services was uncertain. It was not specifically agreed in what manner the property of the testator was to be conveyed or secured to the other parties. It was to be used and controlled by him during his life. There was no restraint by the supposed contract, upon the testator's power to dispose of the same, or any part thereof, during his life, and the amount which he should leave at his death was therefore wholly uncertain. The contract, therefore, by reason of its uncertainty, was one which a court of equity would not be under the necessity of compelling performance of. (*Stanton et al.* v. *Miller*, 58 N. Y., 192; *Robinson* v. *Rayner*, 28 id., 494; *Lisk* v. *Sherman*, 25 Barb., 433; *Neal's Exrs.* v. *Gilmore*, 79 Penn., 421.) The case of *Lisk* v. *Sherman* (25 Barb., 433), was quite similar to this in its leading features. There, the agreement was that the plaintiff was to live with and take care of the testatrix as long as the latter lived, and at her death was to have all the property which the testatrix should have at her death. A suit had been in the first instance commenced for the specific performance of the contract, and such relief had been denied. (See Opinion, p. 437.) Afterwards an action was commenced to recover damages at law for the breach of the contract, and on the trial thereof the court had admitted evidence to show the value of the property of the intestate at her decease, as governing the measure of damages. This was held error, and the opinion of the court, delivered by Justice WELLS, on the point of the uncertainty of the agreement, is as follows : " The uncertainties connected with this agreement forbid the idea that any pecuniary amount of compensation for the plaintiff's services could have been in the mind of either of the parties, or that either could have had in mind any standard by which their pecuniary value could be regulated or determined at the time the agreement was entered into. The services to be rendered were uncertain, both in respect to the time they were to continue, and as to their character and extent. The compensation, also, was equally uncertain."

In this case, the testator, a man in general good health and active for his age, came to reside in the family of his brother in May, 1871, doing chores and other light work about the farm as, at least, part compensation for his support. He died in August, 1872, after

an illness of two or three days. He left, after paying all funeral expenses and other charges of the executorship, the sum of $5,542.96, the whole of which the executor has, by his account, undertaken to appropriate to himself and his sisters, by virtue of the agreement before referred to. It is manifest that the supposed compensation is, at all events, largely in excess of the services and support rendered. To allow such a claim to be enforced in behalf of the interested executor by a proceeding in the nature of a decree for specific performance, is not at all equitable in its results, and ought not to be permitted in a court of equity, unless as the consequence of an absolute and certain contract, clear and definite in all points, and performed by those who allege it. Certainly, the rule authorizing the parties who have rendered these services with an understanding that they were to receive compensation, to recover at law what the services are reasonably worth, is the more just, and less subversive of the statute of wills, and such, we think, is the rule to be derived from all the authorities. In the case of *Parsell v. Stryker* (41 N. Y.), relied upon by the auditor in his opinion, there was a specific agreement in writing to give the plaintiff a certain farm, unincumbered, except by a provision for the support of the mother and an imbecile sister of the plaintiff. The services agreed to be rendered by the plaintiff, had been rendered for many years. The case of *Parsell v. Stryker* was an action in equity for specific performance. The judgment in that case proceeded principally on *Johnson v. Hubbell*, a case in the Court of Chancery in New Jersey, where the son, having by devise from his mother received a larger proportion of her property than had been given to his sister, had, upon the earnest appeal of the father, and upon the promise of the latter that he would leave all his own property to the two children share and share alike, if the son would convey to the sister certain lands to equalize the situation of the brother and sister under the mother's will, the contract being made in the presence of and with the consent of the sister, the son had conveyed the land in question to his sister. The father died, having by his will disinherited the son. On a bill filed by the son for a specific performance of the father's contract, and for general relief, the chancellor refused a specific performance, but held for the daughter to retain the lands conveyed by the son in consideration of the

father's contract was unjust and fraudulent, and ordered her to reconvey those lands to the son. The other cases cited in the opinion in the case of *Parsell* v. *Stryker* are mostly cases arising upon precise ante-nuptial agreements and settlements, and the covenants therein contained. The case of *Jones* v. *Martin,* cited in the case in 41 New York, and also by Chancellor WILLIAMSON in *Johnson* v. *Hubbell* (*supra*), by mistake as from 3 Ambler, is, in fact, reported in 3 Anstruther. It was reversed in the House of Lords, and a full statement of the points in that case is to be found in a note to *Randall* v. *Willis* (5 Vesey, 262).

We think the true rule in such cases, especially when based upon weak and vague parol arrangements, is to be found in *Martin* v. *Wright's Administrators* (13 Wend., 460), and *Robinson* v. *Raynor* (28 N. Y., 494), and that in this case the claimants, whoever they may be, would only be entitled to recover for the actual value of the services rendered, as upon a *quantum meruit,* in an action before some tribunal competent to pass upon the disputed claim. Of course the amount to be recovered by the party or parties entitled to recover in such action, is to be settled by the tribunal before which it is presented for adjudication. It should be the amount which the board of the testator and his nursing during his last sickness were reasonably worth, deducting the value of his services upon the farm. The amount of his property left at his decease furnishes no criterion or standard by which the amount to be recovered is to be measured.

The appellant, in her petition of appeal to this court, amongst other things, alleges for error that the executor, in the account as finally settled by the surrogate, is charged with interest for six months only on the cash in bank at the time of the testator's death, $216, whereas he should have been charged with interest from the time the letters testamentary were issued, on $5,542.96, which would be, it is claimed, about $1,160.76. It appears from the executor's own testimony that the money was at some time transferred to the private account of the executor in the bank to his account not as executor, but as a private individual. The time when this transfer took place is not mentioned. It appears that, up to the time of his death, the bank was, by some arrangement, allowing the testator a certain rate of interest on the deposit, and interest was credited to him on

the pass-book of the bank down to July 1, 1872, about a month before his death. The executor was interested as one of the owners in the bank. It should be ascertained at what time the executor caused the money to be placed to his private account, and all the interest due from the bank up to that time should be charged to him, and from that time interest at the rate of seven per cent up to the time when he filed his final account for settlement.

We think the credit to the executor for the $260, counsel fees, and also of the sixty dollars for auditor's fees, was improper. There appears in the case no particulars or vouchers for these charges. At the time of presenting his final account, the executor then charged for counsel fees twenty-nine dollars only. We therefore conclude that the counsel fee subsequently allowed was for the employment of counsel in the litigation before the auditor, and afterwards in endeavoring to have the joint claim of himself and others allowed against the estate in his hands. The whole proceeding, whereby the executor attempted to get the joint claim of himself and others allowed in his final account, was, as we have seen, illegal and unwarranted. The expenses thereof were not incurred in behalf of the estate, but in the prosecution of his own private claim against the estate.

There can be no justice or propriety in compelling the appellant not only to defend the illegal and unjust claim against her property as legatee at her own expense, but also to pay the expenses incurred by the executor in attempting to enforce the claim in his own behalf and for his own benefit, contrary to the interests of the estate of which he was the trustee. The auditor's fees were, as we suppose, the fees paid to the auditor, on the reference to him, illegally obtained at the instance of the executor, and rest upon the same principle as the counsel fee of $260. We think the counsel fee should be reduced to twenty-nine dollars, the amount originally charged by the executor, and the auditor's fees should not be allowed.

The decree of the surrogate appealed from is reversed, with costs of the appeal to the appellant, to be paid personally by the respondents and not out of the estate, and the proceedings are remitted to the surrogate of Monroe county, with instructions to settle the final account of the executor, upon the principles laid down in this

opinion.  The costs of the proceedings before the surrogate and of the executor on the appeal are not to be allowed out of the estate.

Present — MULLIN, P. J., TALCOTT and SMITH, JJ.

Ordered accordingly.