Barker, J.
The plaintiff lived in the family of the deceased continually; for the period of about thirteen years, commencing when she was seven years old, and leaving when she was nineteen. She was the daughter of Jeremiah Dunkelberg, and, after leaving the family of the deceased, *729 and before commencing this action, she married Mr. Shimer, The first question to be determined is, were the labor and services which the plaintiff performed, in the family of the deceased, rendered in pursuance of an agreement, expressed or implied, that she should receive compensation therefor, to be paid by the defendant, or were they gratuitously performed. The referee has found that it was the understanding and agreement of the parties, at the time the plaintiff became a member of the family of the deceased, that she should be justly rewarded for her service, the terms and conditions of the contract, as found by the referee, being hereafter more fully stated. This was a pure question of fact for the decision of the referee. I think his report on this question is fairly supported by the evidence. In 1866, the father of the plaintiff and the deceased were friends and neighbors, residing in the county of Niagara, and were farmers. The former had several children and was about to remove with his family into the west, for the purpose of establishing a home in that locality; and the latter was childless, his family consisting of himself and wife, who was in delicate health. At this time the decedent was the owner of a farm on which he resided, of the value of about $6,000. Before the plaintiff’s father had determined to remove from Niagara county, Mr. Bander had become attached to the plaintiff who frequently visited his house. After the plaintiff’s father had left Niagara county, and while in the city of Buffalo, on his way west, Mr. Kinder, proposed to him, that plaintiff return with him to his home, and five with him as a member of his family.
To this proposition the plaintiff’s parents consented and she parted with them in Buffalo, and was taken by the decedent to his home. A brother of the plaintiff’s father, who was present when the said interview was had and agreement made, testified as a witness on the trial, that he heard “the conversation at Buffalo between George Kinder and my brother about plaintiff coming back; George asked if my brother would let her come back, she would be company for his wife; my brother said he could not let the child come back; he wanted her to go along; George said her would care for her and bring her up if he would let her come back; just as he would for his own child; then he agreed to let her come back; he wanted her so bad; George and my brother and his wife were near crying; George didn’t say anything about property he would give plaintiff; I remember that the plaintiff went west in 1876; while she was gone George came to my house and talked about plaintiff; he said she had not come back; that if she would come back he would take care of her and do well by her; *730 he said she was a good girl and he wanted her to come hack; don’t remember of his saying anything of the work she had done.”
This is all the direct evidence which can be found in the record, as to the terms and conditions of the-agreement as originally made, under which the plaintiff became a member of the family of decedent. But subsequent to that time, and during the period she resided with Mrs. Kinder, he had frequent conversations with his neighbors and the friends and relatives of the plaintiff as to the arrangement under which she became a member of his household, and the compensation she was to receive, and the mode and manner of its payment. I shall not repeat all the evidence in this connection as given by the several witnesses who heard such statement and admissions of the decedent, but, in substance, they were to the effect: That he had taken the plaintiff as his own child; that she should be amply paid for her services; that he would do for her as a father would do for his own child; that when the plaintiff came to live with him he promised her father and mother that he would do for her as if she was his own child; that he intended to provide for her in his will.
One of the witnesses testified that, in 1874, he was at Mr. Kinder’s house, and they had a conversation about the plaintiff, and he said to the decedent: “There is Tilly (the plaintiff) growing into womanhood—what have you done for her? He said, when I am through with this world’s goods Tilly shall be amply paid. I asked him, ‘how? ” He said, ‘I can’t take with me what I have got; she shall have an ample share of it.’ I said; how? He said, I will make a will. * * * He said when he was through with this world’s goods she should be well paid for her services and kindness to them rendered during Mrs. Kinder’s sickness; she was taking care of her then; he said she should be well paid for what she has done. After the plaintiff had lived there a year or two I had a conversation with the deceased; he said she was left there with him as his own; to be brought up as his own; and he would treat her as his own; they had no children.”
The evidence is convincing and entirely satifactory in its character, that the plaintiff’s services, rendered in the family of the deceased, were not to be gratuitous, but, on the contrary, she was to be rewarded therefor by the payment of a fair and just compensation in view of her age, and the time she might remain in his family, and the character of the services she might render, and the care, maintenance and education she should receive in the family •of the deceased.
In his report the referee states that the agreement was *731 made in October, 1866, and at the time the plaintiff’s father removed with his family from the county of Niagara, the -deceased requested the plaintiff to live with him as his own child, promising that if he would bring her up as his own ■child, and at his death would do by her as his own child, and would make such provision for her in and by his will as would be right and proper in case she were in fact his own child. That the plaintiff’s father consented and permitted the deceased to take her and adopt her as his own ■Child, and from that time forward she lived in the. family of the deceased until September, 1879. This finding is, I think, in all respects fairly sustained by the evidence.
By the terms of the agreement, the plaintiff observing and performing the same on her part, according to its spirit, she might well have anticipated, that on the death of her foster father, she would be generously rewarded by a provision of the will and compensated for her services rendered in the family of the deceased, in a sum beyond their intrinsic value. In August, 1879, the plaintiff ceased to reside in the family of the deceased, leaving the same on account of his ill-treatment The decedent died a few months thereafter, childless and intestate, his wife having died previously. His estate was worth at the time of his death between six and seven thousand dollars.
The mental disturbance which overtook the deceased, after the death of his wife, was doubtless the reason why he failed to perform his agreement and may be viewed as a moral excuse for his ill-treatment of the plaintiff.
The failure of the decedent to perform the contract on his part gave the plaintiff a right of action which entitled her to recover for the intrinsic value of her services, for the time they were rendered, according to their kind and character, without reference to the contract or the value of the property of the decedent at the time of his death. It is well settled that where services are rendered in pursuance of mutual understanding between parties, that compensation for them shall be made by will, and the party receiving the services dies without making the compensation, the party rendering the services is entitled to compensation out of the estate of the deceased as a creditor for the value of the services. The plaintiff is entitled to recover on the ■claim for work and labor performed, and her right is based upon the implied assumpsit of the deceased. Quackenbush v. Ehle, 5 Barb., 469; Robinson v. Raynor, 28 N. Y., 494; Martin v. Wright's Adm'rs, 13 Wend., 460; Lisk v.Sherman, 25 Barb., 433; Patterson v. Patterson, 13 Johns., 379; Jacobson v. Le Grange, 3 id., 199.
Although the plaintiff established a good cause of action, I think the learned referee erred in assessing the damages *732 "by refusing to credit the estate with items of.off-set and payment, which the evidence shows should have been allowed. The finding as to the value of the services is as follows: “ That the services so performed by the plaintiff as aforesaid, were of the value in the aggregate of $780.50, no "part of which has been paid, and there are no off-sets or counter-claims against the same.”
It is manifest that this finding was intended to cover the value of the services during the entire period she lived in- the family of the deceased. In another finding which precedes this one, it is found that during the time the plaintiff resided in the family of the deceased, she performed such work and rendered such services for him and his family as were usually performed and rendered by farmers’ daughters in the locality and circumstances in which he and his family resided; and that she also cared for and waited on his wife during her last sickness; and in the performance of such services she did no more than is usually and ordinarily done by farmers’ daughters, in the locality and circumstances in which the decedent and his family resided.
The evidence which was produced by the plaintiff, with a view of establishing the value of her services, embraced the entire time she resided in the family of the decedent, and some of the witnesses stated the money value of her services during the six years preceding the time she left.
The referee also found, that after the plaintiff went to live with the deceased, that she was regarded and treated as a member of Mr. Kinder’s family, and was provided for, brought up and educated as such by him, and that he and his wife had the exclusive care of her, provided all her clothing, sent her to school during such a portion of the time as farmers’ daughters usually were sent, until she was about seventeen years of age, and clothed her in the manner in which farmers’' daughters usually were clothed, and during all the time she resided in his family, all the obligations or duties of parent to child were fulfilled by said deceased and his wife.
Some of the proofs showed that her services during the illness of Mrs. Kinder were worth one dollar a day; and that during several of the last years she resided in the family they were worth $2.50 per wéek. The evidence fails to show that her services previous to the last six years, were worth more than her support and maintenance. The sum found by the referee is equivalent to $2.40 a week for the last six years she remained with the family. The evidence is undisputed that during these six years she was furnished all her clothing, and the evidence also tends to prove that it was worth sixty dollars a year. During this *733 period she made a visit to her parents, who lived in the state of Illinois, and the deceased supplied her with the money necessary to prepare for and make the journey. These items constitute a just and equitable off-set against the value of her services and should have been allowed.
We, therefore, direct the following order: That the judgment be reversed and a new trial ordered before another referee unless the plaintiff stipulate, within thirty days, to deduct from the recovery the sum of $360, and if she so stipulates, the judgment to be modified accordingly, and as modified, affirmed without costs of this appeal.
All concur.