## McRAE *vs.* McRAE.

### *In the matter of the Estate of* JOHN McRAE, *deceased.*

An intestate, engaged in business, having availed himself of the services of his children, under the expectation and mutual understanding that compensation would be made by way of legacy, but without any special agreement to that effect:—*Held*, that no special request or formal promise was necessary under the circumstances to establish his liability; and the execution of a will which had been drafted in favor of these children, having been prevented by death,—*Held*, that his estate was bound to make compensation.

A stranger, performing services under similar assurances, would be entitled to recover, and the relation of the parties as parent and child, does not detract from the merit of the claim. The services were not gratuitous, nor exacted by means of parental influence, but having been performed under a mutual expectation of compensation in a particular way, there is enough to sustain a promise to pay, and the particular mode of payment intended having failed, the parties are left to their rights as in the case of an ordinary debt.

This case is different from the performance of services gratuitously in the mere expectation of a legacy, the determination whether there should be any compensation or not, being left to the volition of the party benefited, in which case there is no legal liability.

When work and labor are performed under promise of a legacy, if default be made, the right to recover exists, whether the remuneration in the mode contemplated is prevented by accident or design.

M'RAE *vs.* M'RAE.

An investment having been made by the intestate in certain rail road shares,—
*Held*, that the fact of a fall in the market value of the stock was not enough
of itself to charge the administrators with the loss occasioned by the depre-
ciation; but the circumstances should show affirmatively that they acted
unreasonably in retaining the stock, and that the failure to sell was unjustifi-
able.

The intestate in his life-time made an advancement to one of his sons for the pur-
pose of establishing him in business, the son died before his parent, and it
was held that the advancement had been made with "a view to a portion or
settlement in life," as contemplated by the statute, and should be charged on
the share to which the descendants of the deceased son succeeded.

Those provisions of the Revised Statutes which refer to advancements, in case
there be no real estate of the intestate, do not apply to real estate situated in
another state or country, but only to lands in this State. The rule of descent
is regulated as to lands, by the law of the place where the property is situ-
ated; and it could not have been intended to introduce as an element into the
adjustment of the estate of an inhabitant of New York, the various laws of
other States where the intestate might have happened to hold realty. The
statute is to be interpreted generally as applicable only to lands within the
operation of our own laws, and to establish a different construction, special
words must be used to show a special intent.

JOHN JAY, *for petitioner.*

I. The children of H. G. McRae, deceased, a son of the
intestate, are to be excluded on account of the advance made
by the intestate to their father in his life-time.

The Revised Statutes, vol. 2, p. 282, § 83, expressly provide
that, "if any child of such deceased person, shall have been
advanced by the deceased by settlement of a portion of real
or personal estate, the value thereof shall be reckoned with
that part of the surplus of the personal estate which shall re-
main to be distributed among the children; and if such ad-
vancement be equal or superior to the amount which accord-
ing to the succeeding rule would be distributed to such child,
as his share of such surplus and advancement, then such child
*and his descendants shall be excluded from any share in the
distribution of such surplus.*"

II. It is submitted that the debt due by George A. Curtis,
of $1,457.17, and included in the inventory under the head of

"desperate debts," was probably an advance made by the intestate for the benefit of his daughter, Mrs. E. C. Curtis, deceased, the wife of the said Curtis; and that it is incumbent upon the administrator to show by satisfactory proof, that such was not the case. If it was an advance for the benefit of Mr. Curtis, the grand-daughter is to be charged in the division with that amount.

III. It is admitted by the administrator and the administratrix, that on the 27th May, 1853, at Mr. Jay's office, they asked his consent, as attorney for the English heirs, to their taking the stock and furniture set forth in the inventory, at the inventory price, to wit: $5,858.63, of which the three-tenths coming to the English heirs, would be $1,757.58, and that the consent so asked was given, on condition that the said sum should be properly secured to them, with interest at 7 per cent. from that time. This condition having been assented to, and the English heirs advised accordingly, it is submitted that an order be made directing the administrator and administratrix to pay the difference in interest, pursuant to their agreement.

IV. The schedule C, in addition to one charge for funeral expenses, Oct., 1852, and another for removing the remains from the vault of St. Matthew's Church to Greenwood Cemetery, in June, 1853, contains charges for a lot of ground in Greenwood Cemetery, for enclosing the same, and for a monument. It is submitted that these latter items, all subsequent to the funeral and burial of the intestate, have been expended in great part for the future benefit of the survivors in this country, and that the English heirs who are to be in no way benefited, ought not to be chargeable with their full proportion of the amount; as the charges are professedly connected with a proper regard to the memory of their father, it is a matter of great delicacy on their part to object to them, but if the Surrogate shall regard them as fair, the English heirs will be content.

V. Schedule D, contains charges for Margaret McRae's claim for services rendered in the business of the late John McRae, for wages 10 years, at $100 per annum, $1,000; Maria Louisa McRae's claim for 8 years, at $100 per annum, $800; Thomas Clinton McRae's claim for 2 years, at $150, $300; 2 years, at $200, $400; 2 years, at $250, $500—$1,200.

To these claims the English heirs objected at a former hearing, and it being contended by the claimants that the charges should be allowed for the reason that there had been an implied agreement on the part of their father to recompense them by a devise to them of his property in this country, to the exclusion of the English heirs, and that this intention was accidentally frustrated, the point was reserved to be heard upon such testimony as might be offered.

The depositions of sundry parties, including two of the claimants, Thomas C. and Maria Louisa McRae, have been taken. There are two drafts of unfinished wills, made by or for the intestate, one dated 10th June, 1849, the other, 9th October, 1852. The first of these wills devises one-half of the Rome farm, Bradford county, to his son James B. of London.

Admitting that the evidence shows a disappointment on the part of these children at their father's dying without a will: admitting that they had been led by him to expect to inherit the business here, and that in that expectation they had continued to work in it—there is no agreement shown between the claimants and their father, under which they can claim the amount asked as a *debt due by the estate*, or which will authorize the Surrogate in making the allowance.

The assumption of authority on the part of any court to construe a vague understanding as a legal contract, and to give arbitrary damages for the breach of it, would be alike novel and dangerous.

It is not pretended that there was any agreement between the claimants and the intestate, that they should receive the amount now claimed; the contract, if there was a contract, was that they should have his estate in America, and they

might with almost equal reason, ask the court to award them specific damages for the breach of that contract, and to direct an issue *quantum damnificatur*.

And even then it would be a question, to which will validity was to be given—that which excluded, or which included Mr. Jas. B. McRae.

These claims for services should be disallowed.

The depositions show no request to the children to perform these services—no promise to reward them for the services. They show a direction to one child to take what he wanted, and a donation of £100 on going to England. The conversations with the deponents, especially with Rev. Mr. Pound, are contradicted by the draft of the will in 1849, by which he devised an undivided half of a farm to Mr. J. B. McRae, one of the English heirs.

VI. The administrators should be charged for the depreciation in the value of the Hudson River Railroad shares, which ought to have been sold before a fall in the price of the stock.

THE SURROGATE.—The testator came to this country some thirty years since, and for the last twenty years was engaged in the manufacture of silk goods, in which business he was assisted by his children. It is in proof that he declared that his children in England should retain the property there, and his children in New York have the property here; that all his property in this country was the accumulation derived from the earnings of himself and the last named children; that it belonged to the latter, for they had earned it. A draft of a will was prepared, disposing of his property in favor of these children, with the exception of a mortgage of seven hundred dollars, but its execution was prevented by death. A claim is now advanced by the children for services rendered their parent after they attained their respective majorities. The deceased employed no clerks, and when asked for an

allowance or salary by his children, gave them to under-
stand that it would be all theirs : " It will all be yours, let it
lie." In this expectation they continued to labor for him till
his death, receiving no other compensation than their cloth-
ing and board, and pocket-money ; with the exception of one
child, whose expenses on a visit to Europe were paid by his
father. I think the case establishes the performance of work,
labor and services under the expectation and mutual under-
standing of compensation by way of legacy. It is true there
was no special request, and no formal promise, but under the
circumstances neither of these elements was necessary to
establish a liability. The parent availed himself of the ser-
vices of his children after they attained full age, and excused
himself from agreeing to a fixed compensation by holding out
the idea that the fruits of their united labors would all be
theirs on his decease. Such, doubtless, was his intention, but
it was frustrated by death before he gave it formal and valid
expression. Had a stranger labored for the deceased under
similar assurances, he would doubtless be entitled to recover.
The relationship existing between the parties rather enhances
than detracts from the merit of the claim. It would certainly
be a very hard case if the proceeds of the industry of these
children, which they have been disappointed of receiving by
legacy according to their parent's intention, should be dis-
tributed without even allowing them compensation for their
services. These services were not gratuitous, were not made
without the expectation of a return. Nor were they exacted
by means of parental influence, nor received as a gift. The
facts indicate enough to sustain a promise to pay ; there is a
consideration to support such a promise, and the intention to
pay in a particular manner having been undesignedly de-
feated, the agreed and substituted mode of payment having
been prevented, the parties are left to enforce their rights as
in the case of an ordinary debt. In the case of *Jacobson* vs.
*The Executors of Le Grange,* 3 *Johnson R.,* 199, where a
young man, at the request of his uncle, went to live with him,
and the uncle promised to do by him as his own child, and

that he should be one of his heirs, and spoke of advancing money to purchase a farm for him as compensation for his services, the uncle having died without devising anything to the nephew, though the latter had worked for him eleven years, it was held that an action on an implied assumpsit would lie against the executors. The question as stated by the Court was whether the services performed were rendered with a view to any other compensation than such as the testator should voluntarily make by his last will and testament. In *Patterson* vs. *Patterson*, 13 *Johnson R.*, 379, the plaintiff, after he had come of age, lived with and worked for his father, the defendant, who said he would reward him well and provide for him in his will. The action was prematurely brought, but the Court said: "It is evident that the plaintiff is to be compensated for his services by a provision to be made for him by his father in his will, and of course that no claim for compensation was to be made in his father's lifetime. The defendant is bound to make, and it is to be presumed, will make such a provision for the plaintiff by his will as will do him perfect justice, and which may be perfectly satisfactory to him, or which in judgment of law may amount to a satisfaction. Should the defendant wholly overlook the plaintiff in his will, this would be such an act of injustice, that there can be no doubt the plaintiff might maintain an action, and recover a reasonable compensation for his services." The principle governing these cases is, that there being evidence the services were not rendered gratuitously, but upon an understanding there should be compensation in a certain way, there is ground for an action when the compensation so intended has not been made. Where work is performed gratuitously in the mere hope or expectation of a legacy, no action will lie. The services are done on a mere faith or trust in the mind of a single party—the compensation, whether something or nothing, being left entirely to the volition of the person benefited. But this is far different from the case where the person for whom the work is done, promises to pay for it by testamentary provisions. (*Snyder*

vs. *Castor's Adm'rs*, 4 *Yeates*, 353; see *Engleman's Ex'rs* vs. *Engleman*, 1 *Dana*, 438; *Roberts* vs. *Kidd's Ex'rs*, 1 *Yeates*, 209.) It would be a piece of gross injustice to deprive a party who had been promised compensation in that way, of all remedy, and it makes no difference whether the remuneration is prevented as contemplated, by accident or design. In either case there has been a failure to pay. I am therefore of opinion that the claims of the intestate's children are valid demands against his estate. The amount demanded seems reasonable, and not having been controverted, I shall take it as a proper compensation.

It was urged on the accounting that the administrators should be charged with a depreciation in the value of some shares of stock in the Hudson River Rail Road Company. This investment was made by the intestate. The fact of a fall in the market value of the stock is not of itself enough to charge the administrators. The circumstances should show affirmatively that they have acted in an unreasonable manner in retaining the stock, and that the failure to sell was unjustifiable. There is no proof authorizing such a conclusion, and the objection must therefore be overruled.

The intestate in his lifetime, made an advancement to one of his sons for the purpose of establishing him in business. If there be no real estate of the intestate, advancements are regulated by Sections 80, 81, and 82, 2 *R. S.,p.* 98, and under these sections an advancement must be made with "a view to a portion or settlement in life." It is insisted, however, that these sections do not apply because there is "real estate of the intestate to descend to his heirs," in the State of New Jersey. But I do not think that lands in another state or country come within the purview of these sections. The rule of descent is regulated by the law of the place where the property is situated, and it could not have been intended to introduce as an element into the adjustment of the estate of an inhabitant of New York, the various laws of other states where the intestate might have happened to hold realty. Our statutes are to be interpreted generally as applicable only to lands within

the operation of our own laws, and to establish a different construction special words must be used to show a special intent. But even if the fact that the deceased owned lands. in New Jersey avail to except this advancement from the operation of the sections of the statute which regulate advances when there was no real estate that descended, the only result is that we are thrown upon another part of the statute which regulates advances when the intestate left both real and personal estate, and which makes ample provision for charging advancements on the share of a child in his parent's estate. (1 *R. S., p.* 754, §§ 23, 24, 25, 26). Where an advancement has been made to a child, it may on his decease before the death of his ancestor, be charged on the share which falls to his descendants (§ 23). The advancement made by the intestate to his son, H. G. McRea, having been made for the purpose of setting him up in business, was given with " a view to a portion or settlement in life," and therefore comes within the statutory provision to which I have referred. The other objections to the account were decided on the hearing.