NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.— 1880.

WESTON *v.* WARD.

*In the matter of the estate of* RICHARD W. WESTON, *deceased.*

Where executors are directed, by the will, to convert the residuary estate into money, they are still clothed with a reasonable discretion as to the proper time for the sale of the decedent's irregular securities, which they are bound, however, to exercise in good faith.

There is no fixed period within which the executors must exercise their discretion, but the reasonableness of any delay must be determined by the circumstances of each case.

Where executors, clothed with a discretion as to the time when the decedent's securities should be sold, forbear to sell in the exercise of an honest judgment, and loss results to the estate, they are not liable for this error of judgment.

MOTION to confirm auditor's report.

To the account of proceedings of the executors and trustees, objections were filed, whereupon it was referred to an auditor and referee. To his report exceptions were filed on behalf of the three children of decedent, legatees under his will, the executors and special guardian of the infants not excepting. The provisions of the will,

material to a consideration of the questions raised by the exceptions, were as follows :

"First, I direct my executors, as soon as may be after my decease, to pay and discharge all my just debts and funeral and testamentary charges.

"Fourth, I give and bequeath to my executors and trustees hereinafter named, such sum as will purchase an amount of the bonds or securities of the government of the United States of America, whereof the interest is payable in gold, that will produce at the time of the purchase, a net income of $2,500, in gold coin, per annum, in trust, and with power to invest and keep the same invested in such bonds or securities, or in such other securities, and in such manner as to them shall seem most for the benefit of said fund, and of the *cestui que trust* thereof, and to apply the interest and income thereof to the use of my said wife, Sarah Maria Weston, during her natural life. . . . . .

"Thirteenth, I direct my executors, and the survivors and survivor of them, to convert all the rest, residue and remainder of my estate, real and personal, into money, and to divide the net proceeds into three equal shares, and I give and bequeath to my executors and trustees one of said shares in trust, and with power to invest and keep the same invested in the manner aforesaid, and to apply the interest, income and profits thereof to the use of my said son Warren, until he shall attain the age of twenty-five years, and upon attaining that age, to pay over and transfer the same to him absolutely, and in that case I so give and bequeath the same."

By the fourteenth and fifteenth clauses of his will,

decedent made similar provisions, as regards the nature of the investments and their amounts, for his two daughters Rosamond and Helen, giving them life interests.

The above clauses disposed of the principal of the several funds upon the cessation of the trusts.

The decedent died on May 7, 1873. His will bore date December 9, 1870 ; the codicil May 24, 1872. Letters testamentary issued to the executors June 9, 1873. On June 22, 1874, they caused an inventory and appraisement of decedent's personal estate to be made, the whole being appraised at $562,787.15. A portion thereof consisted of one hundred shares of International Railroad Company stock, of the par value of $100 per share, appraised at $50 per share, or $5,000. Fifteen hundred shares of the stock of the St. Louis & Iron Mountain Railroad, of the par value of $100 per share, appraised at $20, or $30,000. Ninety-four shares of the stock of the North Shore Staten Island Ferry Company, of the par value of $10 per share, inventoried as of no value. Seven bonds of the International Railroad Company of Texas, of the par value of $1,000, appraised at forty-six per cent. thereof, or $3,220.

In schedule B. of the account filed herein, the executors say, in reference to some of the above-enumerated shares, "a majority of the stockholders and bondholders of the International Railroad voted to organize and did organize, a new corporation, and the stock is now represented by one hundred and twenty shares of the stock of such new company, the International & Great Northern Railroad of Texas ; an interest certificate of said company for $2,240, and a scrip certificate for $86.50. The

executors took no part in the organization of the new company, but were obliged to take the new stock."

"A majority of the stock and bondholders of the St. Louis & Iron Mountain Railroad organized a new corporation, known as the St. Louis, Iron Mountain & Southern Railway, and this stock is now represented by one thousand, seven hundred and twenty-five shares of" such railway stock. "The executors took no part in the organization of the new corporation, but were obliged to accept the new stock." "Of the securities mentioned in this schedule, the shares of the North Shore Staten Island Ferry Company, and of the Staten Island Gas Patent Company, are believed to be worthless."

"The other securities have not been sold, for the reason that while they have at present merely a nominal value, it is hoped that they will hereafter become more valuable."

In relation to the stock and bonds of the International Railroad Company of Texas, the auditor reported that:

"The one hundred shares (of stock) were appraised in the inventory at fifty per cent. of their par value, to wit, $5,000. And the seven bonds of said road at forty-six per cent. of their par value, to wit, $3,220. The evidence produced before me, other than the said official appraisement set forth in said inventory, is, in my judgment, insufficient to establish the value of said one hundred shares (of the stock), at any time since the death of the testator. The evidence of one or two transactions between private parties does not seem to me to establish actual or market value. The market value of the seven bonds of said company, on December 17, 1873, was $607.30 each, that being the average price realized at an

auction sale of such bonds in the city of New York on that day. Aside from the appraisement in said inventory, the evidence is insufficient to establish any market price or value of said bonds, at any other day or date since the death of said testator."

This finding was excepted to, and it was argued in support of the exception, that the bonds were worth at the time of decedent's death about seventy-five cents on the dollar, and six months after sixty to sixty-four cents; that the shares of stock were worth by the inventory forty-six cents; that "now" the bonds are worth fifteen to twenty cents on the dollar, and the stock nothing; and, generally, that the executors erred in that they did not dispose of them in a reasonable time.

As to the St. Louis & Iron Mountain (and Southern) Railway shares the auditor reported as follows:

"The market value of each of said shares

| | | | | |
|---|---|---|---|---|
| On June 12 to 18, | 1873, | was | | $80 |
| "    "    20 " July 10, | " | " | | 75 |
| " July 11 " August 4, | " | " | | 70 |
| " August 5, | " | " | | 69 |
| " December 4 and 5, | " | " | | 55 |
| " December 6 to 16, | " | " | | 53 |
| " February 9, | 1874 | " | | 67 |
| "    " 20, 21 and 24, | " | " | | 64 |
| " March 5 to 17, | " | " | 60¼ to 60 | |
| "    " 17, | " | " | 58½ | |
| "    " 20 to April 2, | " | " | 54 | |
| " April 9 " May 1, | " | " | from 47 to 30 | |
| " May, | " | " | | 33 |
| " June, | " | " | | 15 |
| " August, | " | " | | 12 |

| On September 4, | 1874, was | $15 |
| "    "    10, | "    " | 10 |
| "  October, | "    " | 15.50 |
| "  November, | "    " | 17 |
| "  April 25, | 1879,  " | 22 |

" The testator purchased one thousand shares of the said stock in August and September, 1872, at the following prices : seven hundred shares at $59 ; one hundred shares at $58.75 ; two hundred shares at $59.25 each, making the aggregate purchase-price of the one thousand shares $59,168.50.

" The executors found a memorandum account of the purchase of said shares, in a box containing securities, and at the bottom of the said account were the words, ' To be held firmly ; a dividend expected in two years,' in the handwriting of the testator.

" It is not known precisely when or at what price the testator purchased the other five hundred shares of said stock. The executors found them in the hands of the brokers, who purchased them for the testator, and subject to a lien for $45,000 of their purchase-price, they having advanced the same. The executors paid this $45,000 on June 8, 1874, with interest.

" The testator had been engaged in business, in partnership with Mr. Gray, one of his executors, since 1846, a period of twenty-seven years. He was sick but a short time, and attended to his business up to a week before his death.

" The stock of the St. Louis & Iron Mountain road brought $102 in 1872. In January, 1873, it was $94. In February of that year, the company paid to its shareholders a dividend of three per cent. From this time its

price in market had declined, so that, about the time the testator died it was selling at eighty, and it continued to decline, as shown in the statement of market-values before given.   No facts causing such decline are shown prior to the great panic which occurred in September, 1873.

"No proper sale of these stocks could have been made after the commencement of the panic for some months. In November 1873, there were some sales at fifty-five.   In December they began to recover.

"The highest point of the recovery was reached in the early part of February, 1874.   From that time the market price of said stocks gradually declined, with fluctuations, until it reached $10.

"The principal revenue of said road was derived from carrying iron.   The iron business was prostrated after the panic, so that the revenue from this source 'almost entirely fell off.'   No dividend has been paid by the company since February, 1873.

"The executor Ward owned several thousand shares of the stock of said road, which he continued to hold. In February, 1874, he bought one thousand additional shares at $65.50.

"Baring Brothers, bankers, of London, for whom Mr. Ward was agent in this country, also owned several thousand shares, and they have continued to hold them to the present time.   This road was consolidated with several other connecting roads in May, 1874.   This scheme of consolidation was in motion several months before the date last mentioned.   The stock was $10,000,000, and it was at the time of said consolidation indebted in a like sum, and was mortgaged for the greater part of this indebtedness.   The road was projected with special refer-

ence to the iron business.  No such depression of this business had been known in the history of the road, as followed the panic of 1873.

"The said executors, shortly after the death of the testator, before letters testamentary were issued to them, and from time to time thereafter, consulted together, and sought advice from others supposed to be competent to advise on the subject, as to whether it was advisable to sell said shares and bonds, and they came to and held the conclusion that it would be for the interest of the estate to defer selling, and to hold said stocks and bonds for better prices than from time to time prevailed.  They believed and remained of the belief that more would be realized to the estate by deferring the sale than by selling at any prices which said bonds and stocks would have brought since the death of the testator.

"For that reason they have not sold or offered them for sale.

"In so holding said stocks and bonds for better prices, said executors acted according to their best judgment, for the interest of said estate."

The exceptions controverted this finding of facts in the following particulars, viz. :

1st.  That the auditor should have found that the one thousand shares purchased in August and September, 1872, were the only shares of said stock which were assets of the estate ; that he erroneously found that the testator purchased the other five hundred shares ; that the executors found them in the hands of the brokers ; that such brokers purchased them for the testator ; that such five hundred shares were subject to a lien for $45,000 of their purchase-price, or that said brokers had

advanced the same ; that no proper sale of these stocks could have been made after the commencement of the panic for some months ; that he erroneously made findings, and based his decision on the dealings of the executor, Ward, and Baring Brothers, matters which were immaterial and irrelevant ; that he erroneously found— that the executors acted for the interest of the estate ; that they were concededly entitled to take a reasonable time in which to convert said shares and invest the proceeds ; that he erroneously found or implied that they would not be chargeable with the loss by depreciation within this time ; and the exceptions further controverted all of the auditor's deductions from the facts so found by him.

The auditor reported that the ninety-four shares of the North Shore Staten Island Ferry Company have not had any market value since the testator's death, and that the executors were unable to sell the same, to which exceptions were filed.

Schedule B. of the account contained the following item of loss to the estate.

" Loss on $57,000 U. S. bonds, 6s of 1881.

Cost                  $66,191.25
Sold for              62,985.00—$3,206.25."

In overruling the objection to the allowance of which, the auditor says : " If the executors had retained those bonds until they were called in by the government, they would have received only their par value. They sold them at a premium, although at less than they had cost. It does not appear that the estate, or those interested in it, would have been any better off if such sale had not

been made. It does not appear that any one has been injured by that sale." . .

It appeared, from the account, and the testimony of the executor, Gray, that the executors, on June 19, 1873, purchased $43,000 U. S. 6s, 1881, at 116⅓, on account of the trust for H. E. Weston, at a cost of $49,987.50 ; on June 18, purchased $50,000 U. S. 5s, $\frac{10}{40}$s, at 112¾, on account of the trust for Mrs. Sarah M. Weston, $57.437.50 ; on June 18, 19, 21, bought $300,000 U. S. bonds of 1881, for and on account of residuary legatees, at a cost of $348,637.46. The loss occurred upon a sale of $57,000, in amount, of the bonds included in the last purchase.

Exceptants claimed that the executors should be personally charged with such loss.

The executors' account of proceedings stated that decedent "was the owner in fee, at the time of his decease, of an undivided half of a country place at Dobbs' Ferry, in the county of Westchester, and state of New York. Said country place was subject to the lien of two mortgages, one for $4,000, and the other for $50,000. There are upon it a valuable dwelling and outhouses, which necessitated the care of a competent person.

"The said mortgages have since the death been paid off, and said executors have paid one-half thereof out of the moneys in their hands belonging to said estate.

"The executors have also paid one-half of the taxes imposed upon said country place, one-half of the insurance, one-half of the interest on said mortgages, from time to time, as said interest became due, and one-half of the expenses of taking care of said place, dwelling-house and outbuildings."

In overruling the objection to such payments, the auditor found "that from the testator's death to the present time, there has been no such demand or market for the Dobbs' Ferry property, or similar property, as to establish a market price therefor; and that said executors have not been able by due diligence to effect a proper sale of the said property. I do not think that the objections, in respect to said prices of property, have been sustained by the evidence."

The exceptions sought to charge the executors with the expenses and the amount of the depreciation of said property.

In relation to this property, and also the North Shore and Staten Island Ferry Company, the referee reported that he was notified, after the submission of the case to him, by the counsel for all the objectors, except the infant, Penrill Meiggs, that the objections in respect to them would not be pressed. Messrs. Man & Parsons appeared as proctors for the objectors until after such submission.

MARTIN & SMITH, *for executors;* AARON P. WHITEHEAD *and* JOHN DUER, *of counsel.*

WEEKS & FORSTER, *for contestants.*

E. R. MEADE, *special guardian;* SAMUEL G. COURTNEY, *of counsel.*

THE SURROGATE.—An examination of the testimony in this case justifies the findings of fact contained in the referee's report, and which are not seriously controverted by the contestant's counsel. Hence, no extended abstract of the testimony will be necessary for the determination of the motion, and the only real points to be considered and determined are, first, whether the executors and

trustees had, by the terms of the will or by necessary implication, a discretion as to when sales should be made of the irregular securities, for the purpose of the investment provided for by the will; and, second, if such discretion was conferred upon them, or to be implied from the nature of the trust, whether they have so exercised that discretion as to exempt them from liability for the loss resulting thereby to the estate.

The language of the fourth clause of the will is somewhat obscure, for the reason that, in the first part of the clause, the testator gives to his executors a sum sufficient to purchase an amount of government bonds or securities to produce interest in gold at the time of the purchase, a net income of $2,500 per annum, in trust, which seems to imply the duty of the executors to purchase; and yet this provision is followed immediately, and apparently as a part of the same sentence, by a power to invest and keep the same invested in such bonds or securities (meaning governments), " or in such other securities and in such manner as to them shall seem most for the benefit of said fund, and of the *cestui qui trust* thereof "

It is probable that the decedent intended to limit the authority of the executors to the investment of this fund in national securities, without any discretion, and to confer upon them the broad discretion contained in the latter portion of the clause in respect to the re-investment of the fund. Is it not more reasonable to presume that the discretion was intended to apply to the first investment as the result of the possible change in the price of government securities, which might make it more desirable to invest in other securities? It seems to me that

the latter construction is the more reasonable one, and is strengthened by the thirteenth clause, which directs his executors to convert the remainder of his estate into money, and divide the proceeds into three parts, giving his executors and trustees the said shares respectively, in trust, to invest and keep invested in the manner aforesaid, for the reason that, from the nature of his property, considerable time would be necessary for the judicious conversion of it into money. It can hardly be assumed that the decedent intended to have his entire residuary estate invested in government securities at such future period, without any discretion to be exercised by his trustees, however great might be the premium upon such securities, or their early liability to be called in by the government. I am, therefore, of the opinion, that the discretion conferred upon the executors and trustees, to invest in other securities than governments, as should seem to them most for the benefit of the fund and *cestui que trusts*, was intended to be conferred upon them in respect to the residuary fund.

It is, however, proper to observe that this is a collateral point, for the reason that, in respect to the obnoxious securities, there is no claim that their proceeds have been improperly invested, but it is claimed that they have not been converted as required, and yet, it could hardly be urged that securities found in the hands of the testator, if such as the law and the will justify, were required to be converted.

This brings me to the inquiry whether the executors were vested with any discretion as to the conversion of the residue of the estate into money and the division of its proceeds into three equal shares.

In the case of Buxton v. Buxton (1 *Mylne & C.*, 80), the testator by his will directed his executors, with all convenient speed after his decease, to call in and convert into money all his estate not theretofore disposed of. The decedent died possessed of Mexican bonds, which one of the executors held a year and seven months after his decease, and which were afterwards sold at a lower price than might have been obtained for them at an earlier period. It appeared in that case that the executrix, through her solicitor, repeatedly wrote to the executor pressing the sale of those bonds, and asking him to join her in their sale. The executor refused on account of the declining market-value of the bonds, and afterwards suit was threatened against the executor, and he was notified that he would be held personally responsible for any loss. The master charged the executor with the loss, the executor excepted to his report, and the master of the rolls, at the top of page 93, says : "A direction to convert with all convenient speed is no more than the ordinary duty implied in the office of an executor, and there must necessarily be some discretion. . . . The real question for the consideration of the court is, whether a reasonable discretion has been here exercised by the executor ;" and after stating that the executor had been vigilant and attentive, and exercised his best discretion, he says, at the bottom of page 95 :  "I can find no case and none has been produced in which an executor has been called upon to bear the loss that has arisen because, in the *bona fide* exercise of a reasonable discretion, the conclusion he came to has turned out unfortunately ;" and after stating that his co-executrix had no right to control his discretion, the court concludes : "that the

master erred, and that the executor, in delaying to dispose of the bonds, exercised a just discretion." *Williams on Executors* (p. 1530) under the head of Devastavit, states that the rule of liability of executors and administrators is founded on two principles; first, that in order not to deter persons from undertaking these offices the court is extremely liberal in making every possible allowance, and cautious not to hold executors or administrators liable upon slight grounds.

Second, that care must be taken to guard against an abuse of their trust. In King *v.* Talbot (40 *N. Y.*, 76), the testator's will intrusted to his executor's discretion the settlement of his affairs and the investment of his estate, for the benefit of his heirs. Judge WOODRUFF, at page 87, in speaking of this provision, holds that it neither added to, nor affected the duty and responsibility of the executors ; that without it they were clothed with discretion, and with it, their discretion was to be exercised with all the care and prudence belonging to their trust relation to the beneficiaries. Authorities might be multiplied upon this point, but as those cited have not been modified or overruled, I am of the opinion that they fully justify the conclusion that, in respect to the sale and conversion of decedent's securities, the non-sale of which, by the executors and trustees, has occasioned loss to the estate, they had a discretion as to the time when it was proper to sell, and as it seems that there is no claim that they omitted to convert them *mala fides*, I am brought to the consideration whether the delay and neglect was such as to justify the *presumption* of bad faith, and if not, whether the exercise of their discretion, in good faith, has exonerated them from personal liability.

In the discussion of this question, it is not easy for parties interested to leave out of view the fact that apparently a considerable loss has resulted to the estate by the failure to sell, and yet that fact has no legitimate force in the argument in determining the question of good faith. For, suppose the executors had continued to hold the stocks mentioned until six months before this accounting, because there was a continuous decline in the market value, under the honest belief that the market would mend, and the estate be saved from loss— that belief being based upon the opinions and transactions of intelligent business men—and that, in consonance with that judgment, there had been a change in the market, and those stocks had risen to the value which they had at testator's decease, in such a case, there would appear to be no ground for either imputing bad faith, or error of judgment; indeed, in the matter of the St. Louis Iron Mountain & Southern Railway stock, though on September 10, 1874, it ran down to $10 a share, it is now quoted at over $50, showing a fluctuation that might well have embarrassed the trustees.

In respect to the stock and bonds of the International Railroad Company of Texas, if the referee is right in his finding that since December, 1873, there is no evidence to show the market value of said stock and bonds, which was prior to the making and filing of the inventory, there would seem to be no sufficient proof to justify the personal charge against the executors, at the appraiser's valuation; for the testimony shows that there was a gradual decline in the market until the bonds reached fifteen to twenty per cent., and the stock became worthless; and such is the argument of contestant's counsel.

If the executors had a discretion as to the time of sale, there would seem to have been an honest exercise of it, in not selling said bonds and stock on a falling market. Substantially the same may be said as to the St. Louis & Iron Mountain Railway Company stock, also as to the shares of the North Shore Staten Island Ferry Company, which appears not to have had any market value since testator's death.

In the determination of this case, it is to be observed that the executors and trustees stood in a most extraordinary and exceptional position, for they became vested with the property upon the eve of the most depressing and disastrous commercial revulsion that has ever visited this country, which disturbed and depreciated market values to an alarming extent—the approach of which could not have been anticipated, or the length of its continuance predicted. The testimony shows that with large business experience the executors had been associated in business with the decedent, enjoyed his confidence, and may be supposed to have understood his views in respect to the value and proper treatment of the stocks and bonds in question ; and, as to the Iron Mountain Railroad stock, the decedent left a memorandum, expressing the purpose to hold the same "firmly." It also appears that the executor, Ward, manifested his confidence in the value of the stock, by a considerable purchase thereof in February, 1874, at sixty-five and one-half per cent., and that his principal, Messrs. Baring Brothers, owned several thousand shares, which they continued to hold at the time of this accounting, all of which seem to have a significant bearing upon the question of good faith.

The exception to the allowance to the executors, of the $45,000 paid to Ward, Campbell & Co., for the purchase price of five hundred shares of the stock of the St. Louis & Iron Mountain Railroad Company, should be overruled, for the reason that the testimony shows that the purchase had been made on the order of the decedent, and was held by them as security for the payment of the purchase price, and there was a liability on the part of the estate to pay therefor, without regard to the question whether the stock was then, or was likely to become, worth the amount.

Having reached the conclusion that the executors and trustees, in this matter, have a discretion which they were bound to exercise in good faith, as to the sale of the irregular securities, and that they did act in good faith, two questions in this connection remain to be considered.

First, whether the exercise of such discretion was limited to any particular period of time, and if not, whether, second, they are exonerated by the finding that they acted in good faith.

In Wood v. Pennoyer (13 Ves., 325), the question arose as to the payment of interest on legacies, and it was held that the general rule for convenience was, to consider the personal estate reduced to possession a year from the death of the testator, and, therefore, interest was chargeable from that time, though actual payment might, in many instances, be impracticable; and the year was made the limit only for the purpose of setting the interest running, though it appeared in that case that there were large portions of the personal property that could not have been, by any diligence, reduced to possession within the year, by the executors.   In Dimes v. Scott (4

*Russ. Ch.*, 195), the testator directed his trustees to con-
vert the residue of his estate into money, and invest the
proceeds in government or real securities.   The trustees
permitted a share in an Indian loan at ten per cent., to
remain for several years, paying the interest to the
*cestui que trust ;* the loan being paid off, they invested
in three per cents. when the funds were so low that the
amount purchased was considerably greater than if pur-
chased at the end of a year from the testator's death.   It
was held that the *cestui que trust* were only entitled to
the dividends of so much three per cent. stock as could
have been purchased at the end of the year.   The Lord
Chancellor, at page 207, on the authority of Howe *v.*
Lord Dartmouth (7 *Ves.*, 137), recognizes the duty of
the trustees to have sold the property within the usual
period after the testator's death, and charged the execu-
tor with the difference between the interest which the
fund so converted would have yielded, and the amount
actually produced by the fund.   This case was decided
in 1828.   The case of Buxton *v.* Buxton, above cited, was
in 1835, and sustained the executor's delay in the sale for
nineteen months, and the opinion of the court attempts
to fix no limit, but clearly indicates that no particular
limit is or can be established, as the good faith exercise
of discretion can alone fix the limit, which obviously
must depend upon the facts of each particular case.   In
Hughes *v.* Empson (22 *Beav.*, 181), a loss occurred by the
non-sale of Crystal Palace shares, which bore a premium
at testator's death, but subsequently fell to a discount.
The executors were charged with the value of the shares,
at the end of two months, because they had neglected to
realize, and which, as I read the case, had not been sold

at the accounting. The master of the rolls, on full consideration, varied the certificate to twelve months, and in considering the question, he says, at the bottom of page 183, that, under the circumstances of the case, he should have considered it prudent to sell at the earliest period; but in all these cases a large discretion is to be allowed to the executors, and that he could not fix any particular period; and while he thought two months reasonable, the executor might fairly consider it twelve months, and he only charged him the loss which occurred by reason of the non-sale at the end of twelve months. In the case of Gillespie *v.* Brooks (2 *Redf.*, 349), the executor's inventory of bank, insurance, and other stocks, in 1865, amounted to over $71,000, and they were held until February, 1875, and realized over $67,000; and it appeared that eighteen months after letters were issued, they were worth over $70,000. It appeared that, in consequence of the great fire in Chicago in 1871, the value of several insurance stocks considerably decreased, and some were rendered worthless, up to which time there appears to have been no effort to convert them into money. Nor was there any evidence of material fluctuation in their market value; and I charged the executors with the loss, which occurred by reason of their failure to sell at the end of eighteen months after the receipt of letters. At page 359, it was stated that the trustees were chargeable with the duty of making the required investments, within a reasonable time after they had assumed the trust, and that the counsel for the legatees conceded that eighteen months would be a reasonable time in that case. But there was no attempt therein to fix any definite period as a limit to the discretion of the

trustees. *Perry on Trusts* (§ 439), lays down the rule
that there is no fixed time within which executors are to
get in the choses in action of the testator; that they
must use due diligence, and what is due diligence depends
upon the existing facts in every case, and a large discre-
tion must necessarily be vested in the executor; that,
if it be clear that the trustees have a discretion to sell
or not, according to their judgment, the case will be
governed by the intention.

These authorities, as well as reason, justify the con-
clusion that no definite or inflexible period can be fixed
for the exercise of a conceded discretion, but that it must
be determined from the circumstances of each particular
case. The circumstances of this case does not warrant
the fixing of that limit prior to the filing of the account
in this proceeding, although it is evident that the time
will come and, perhaps, has come, when, in the exercise
of a prudent discretion, it will be, or has become the duty
of the trustees to sell; for it cannot be assumed that such
a discretion is without limit, and I only intend to say
that, on the evidence, it has not expired.

In Thompson *v.* Brown (4 *Johns. Ch.*, 619), the chan-
cellor, at p. 629, holds in substance, that a trustee acting
in good faith is treated with liberality and indulgence, and
where there is no willful misconduct or fraud, he will
not be held responsible for loss, especially when he acts
under the advice of counsel; and Chancellor KENT, at
p. 627, on commenting upon this point, says: "The ad-
ministrators acted in this case in good faith; they re-
posed confidence where the intestate had before reposed
it, and acted exclusively for the interest of others. It
was, at most, but an error of judgment and a want of

sharp-sighted vigilance, and it would have the appearance of great rigor, and be hardly reconcilable with the doctrines of the court, to make them responsible for the goods so wasted by the surviving partner." (Lansing v. Lansing, 45 *Barb.*, 143.)

In MacRae v. MacRae (3 *Bradf.*, 199), the question arose whether the executor should be charged with the depreciation of certain stock, in which the decedent had invested, and which appears to have been retained by the administrator. At p. 206, the learned Surrogate says : "The fact of a fall in the market value of the stock is not of itself enough to charge the administrators. The circumstances should show affirmatively that they have acted in an unreasonable manner in retaining the stock, and that the failure to sell was unjustifiable." (See Routh v. Howell, 3 *Ves.*, 565 ; Johnson v. Newton, 11 *Hare*, 160.)

In Garrett v. Noble (6 *Simon*, 504), the executors were directed by the will to call in the testator's personal estate, with all convenient speed, but they continued his trade for some years, and ultimately a considerable loss was sustained. The Vice-Chancellor refused to charge them with the loss, as they had acted *bona fide*, and according to the best of their judgment, and at page 516, he says : "The rule of law is that where trustees *bona fide* exert themselves to discharge their duty, and merely commit an error in judgment, unless there is a plain violation of trust, they shall not be visited severely. The fair exercise of their judgment is a protection to them, although the consequences may be bad." In King v. Talbot, above cited, Mr. Justice WOODRUFF, at p. 85, says : "My own judgment, after an examination of the subject, and bearing in mind the nature of the office of

trustee, its importance, and the considerations which alone induce men of suitable experience, capacity and responsibility to accept its usually thankless burden, is that the just and true rule is, that the trustee is bound to employ such diligence and such prudence in the care and management, as in general prudent men of discretion and intelligence in such matters employ in their own like affairs."

These authorities appear to me to justify the conclusion that the executors and trustees, having been clothed with a discretion as to the time when the securities mentioned should be sold, and having foreborne to sell, in the exercise of an honest judgment, believed to have been in furtherance of the best interests of this estate, though it has, or may prove disastrous, are not liable for their error of judgment in that respect.

I have examined the leading cases cited by the contestant's counsel, and they do not appear to me to substantially militate against the conclusion thus reached. Heinemann v. Heard (50 N. Y., 27), was a case where an agent was directed by his principal to purchase several specific descriptions of silk at prices named. The agent neglected to make the purchase, though he could have made it, and excused himself on the ground that he expected prices to be lower, whereas they advanced, and the agent was charged with the damages, the court holding that his orders gave the agent no discretion. In Adair v. Brimmer (74 N. Y., 539), the executors were empowered by the will to sell certain real estate and invest the proceeds in other lands, bonds and mortgages, or in such securities as they should deem safe and for the greatest benefit of the *cestui que trust*, and they

transferred the lands, being undeveloped coal lands, for the purpose of organizing a mining corporation, to develop and work them, taking pay in the stock of the corporation; and through various operations of the company, the pretended investment yielded no income. It was held that the bonds of a railroad, secured by mortgage on the lands, issued to raise funds to build the road, were not such a security as a prudent executor or trustee would voluntarily have accepted as an investment for trust funds, or courts of equity sanction; and could not be sustained as an investment under his power, and that the executors became personally accountable to the estate for the value of the lands. There was no exercise of a discretion, but a plain violation of the mandate of the will. In Ackerman v. Emmot (4 *Barb.*, 626) the executors by the decedent's will were empowered to make investments, generally, without any express directions as to the method in which they should be made, and they made investments in bank stock which depreciated, and a large loss was sustained, and it was held that they were liable to the estate for the loss, for they had no discretion, but by law were confined in their investments to real and government securities. The same principle was adjudged in the case of King v. Talbot, above cited.

The case of Clough v. Bond (3 *Mylne & C.*, 490), seems to have no bearing upon this case, except as the Lord Chancellor, at page 496, in discussing the duties and liabilities of a personal representative of an estate, cites Phillips v. Phillips (*Green Ch. Cas.*, 11), to the effect that if an administrator omit to sell property when it ought to be sold, and it be afterwards lost without any

fault of his, is liable, or if he leave money due upon personal security, which, though good at the time, afterwards fails, he shall be held liable ; citing Powell v. Evan (5 *Ves.*, 839), and Tibbs v. Carpenter (1 *Mad.*, 290).

In Powell v. Evans (5 *Ves.*, 838), the testator left, among other property, the bond of one Price, guaranteed by one Roberts for the sum of £300. It appeared that Price, for a time after the executor received letters, was able to and would have paid the amount if called upon, and that the executor made no effort to collect, nor any inquiry respecting the solvency of the parties, one of whom became bankrupt, and the surety absconded, and the whole amount was lost. The master of the rolls held that the executor was guilty of negligence, and therefore liable.

The forgoing consideration covers the contestant's exceptions to the referee's findings, as to the stock and bonds of the International Railroad Company of Texas, also as to his findings respecting the St. Louis & Iron Mountain Railway shares, including the finding as to the five hundred shares thereof found in the hands of the brokers, the purchase for decedent, the lien thereon ; that no proper sale of the stock could have been made after the panic ; that the executors acted for the interest of the estate ; that they had a reasonable time to convert the same, and were not chargeable with the depreciation, together with all the exceptions as to the referee's deductions from the facts found by him relating thereto. Also, the exceptions to his findings respecting the North Shore Staten Island Ferry Company, which are stated in from the 1st to the 42d exceptions, except the 3d, 4th, 5th and 20th, which relate to another matter to be con-

sidered—which, however, have not been considered separately, because they are iterations and reiterations of the same objection, and because life is too short, and other duties are pressing.

The statement of the loss on sale of government bonds, as stated in schedule B., appears, by the evidence, to have been an error in respect to the particular bonds sold, and the testimony shows that the sale, instead of being made from those set apart for particular legatees, was from bonds which were purchased generally for the benefit of the residuary legatees, and had not been set aside or assigned to any particular legatees, amounting to $300,000 ; and the evidence further shows that subsequently $57,000 of this $300,000 were sold at a price less than was paid for them, but still at a premium. But there is no evidence that they could have been sold at a better rate at a subsequent period, and it does appear that the sale was made for the purpose of paying off an incumbrance upon the country residence at Dobb's Ferry, and to pay other liabilities. There is nothing tending to show that the executors acted either in bad faith or negligently in the sale, or that it resulted in any loss to the estate. Hence the refusal of the referee to charge the executors personally, with the difference between the purchase price and the amount realized on sale, was proper, and the exception thereto should be overruled.

Ordered accordingly.